IN THE COURT OF CRIMINAL APPEALS

                                           OF
TEXAS

 

                                                                              

                                                    NO.
AP-76,284 & AP-76,285



 

 

                            EX
PARTE LAWRENCE JAMES NAPPER, Applicant

 

                                                                              



                         ON
APPLICATION FOR A WRIT OF HABEAS CORPUS

                                                      FROM HARRIS COUNTY



 

 

 

Keller,
P.J., delivered the opinion of the
Court in which Meyers, Womack, Keasler, and
Holcomb, JJ., joined.  Cochran,
J., joined except section II B 2. 
Price, Johnson, and hervey, JJ., concurred.

 








Applicant
was convicted of aggravated sexual assault and aggravated kidnapping.  Some of the evidence supporting the
convictions involved DNA testing conducted by the Houston Police Department
(HPD) Crime Lab.  After widespread
problems were discovered with the HPD Crime Lab, the present case was subjected
to further investigation, including additional DNA testing.  Applicant has filed an application for a writ
of habeas corpus based upon this further investigation.  He alleges, among other things, that agents
of the State consumed the entire DNA sample in bad faith, that a state witness
perjured himself or gave false testimony, and that defense counsel was
ineffective for failing to discover the problems with the lab=s testing and its analysis of test results.  We conclude that, despite problems with the
lab, applicant=s claims are without merit.  

                                                              I.
BACKGROUND

                                                                 A.
Before Trial

                                                             1.
The Kidnapping

On February
11, 2001, six-year-old AE.T.@ was kidnapped. 
One of E.T.=s friends was ten-year-old Remington Allen.  While E.T.=s
mother worked that day, Remington=s grandmother cared for E.T., his nine-year-old
brother AJunior,@ and his ten-year-old sister Denetta.  Remington, Junior, and their friend Carlos
went to a nearby park.  Denetta and E.T.
walked with them, but crossed the street to go to a store.  Denetta went inside the store.  E.T. may have accompanied her, but at some
point he was outside again.  While
Remington, Junior, and Carlos played at the park, they saw a man drive up in a
car and tell E.T. to Acome here.@  Remington
told E.T. not to get in the car.

The trial
testimony of the children diverged somewhat at this point.  Remington testified that the man got out of
the car and acted like he was picking something up.  Remington also testified that he saw the man
hand E.T. some money when E.T. got into the car.  However, on cross-examination, Remington
agreed that he never saw the man.  Junior
testified that he saw the man inside the car and that the man had a mustache
and was wearing sweats.  On
cross-examination, Junior agreed that he did not remember much about the car or
the man inside the car because he did not see the man.   Junior further testified that he did not
know if the man ever got out of the car. 
E.T. testified that the man tried to get him to take money and then got
out and put him in the car.  








Remington,
Junior, and E.T. all testified that the car sped away quickly once E.T. was in
it.  Junior and Remington chased the
car.  Remington picked up his scooter and
threw it at the car, but the car did not stop. 
The children remained at the park for Aa
little bit@ to see if the man would bring E.T. back.  The children then went to AMomma Ruth=s@ place, which was close by, but no adults were home,
so they went back up the street to Remington=s
grandmother=s house.  At
first, Remington=s grandmother did not believe the children=s story about E.T. being kidnapped, but once she
became convinced, she called the police.

At trial,
Remington described the car as a Aburgundy-like@ Oldsmobile with a white top.  When asked whether the wheels were shiny, he
responded negatively.  Junior testified
that the car was dark green with a blue top, and scratches at the top.  Both Remington and Junior testified that they
had picked out a car in a videotape lineup, but they were not asked which car
they picked.

Houston
Police Officer D.D. Thompson was dispatched to the scene at 3:12 p.m. and
arrived at 3:19 p.m.  According to
Officer Thompson, the children described the kidnapper=s vehicle as an OldsmobileCsome said a Monte Carlo.  He explained that the Achildren couldn=t pinpoint exactly what make and model it was.@  The
descriptions and the colors given by the children were not consistent.  The car was variously described to him as a
two-door or a four-door, as dark blue or dark green, with a rusty top or a
black top or a vinyl top, and with chrome wheels.  Officer Thompson dispatched a description
that included model years from 1980 to 1990. 

Sergeant
Larry Hoffmaster testified that Junior described the car as a mid-sized gray
car with chrome rims and with damage to the front around the headlights.  Sergeant Hoffmaster further testified that
the children were taken to a police sketch artist to make a composite drawing
of the suspect.  The general broadcast
for the suspect indicated a Askinny black male,@ but
Sergeant Hoffmaster acknowledged that applicant was not skinny.  When asked if he developed any suspects whose
vehicles were black or dark in color, Sergeant Hoffmaster said no.








                                                                   2.
Aftermath

E.T. was
returned to the neighborhood the next day. 
He was crying, and his face was bruised and swollen.  E.T., who is African-American, described his
kidnapper as having skin color that was a little darker than his own.[1]  E.T. described the man as having no facial
hair, wearing eyeglasses, wearing a black hat, and wearing a purple jacket with
green (or a purple and green jacket) and matching purple pants.  E.T. described the car as a dark navy blue in
color, like his tennis shoes, with a brown interior, and with a black console
between the front two seats.  

E.T.
related that the man offered him money, and when E.T. got closer, the man
pulled him into the car.  The kidnapper
took E.T. to a house that had a brown couch in the front room and a television
next to the bed in the bedroom.  He tied
E.T.=s arms and legs to the corners of the bed.  E.T. also said that the man rubbed Aorange grease@ on his body. 
The man told E.T. that Aif I tell anybody he=s
going to kill me.@  When asked
if he had been touched inappropriately, E.T. Aclammed
up@ and started Atearing up.@  When asked
by another officer what happened after he was tied to the bed, E.T. became
extremely upset, crying and breaking down into hysterics.








E.T. was
taken to the hospital the day he was returned. Pursuant to instructions from
Chemist Reidun Hilleman at the HPD Crime Lab, Officer Lorenzo Verbitskey
swabbed E.T.=s face. 
Verbitskey let the resulting two swabs air dry in his office.  He then delivered the swabs to Hilleman.  Hilleman also received anal and oral swabs
and clothing.  Hilleman gave the swabs to
Mary Childs-Henry, a forensic biologist at the HPD Crime Lab who analyzed body
fluids and conducted serology testing. 
Childs-Henry extracted two tubes of DNA from each of the face swabs
(four tubes in all).  For each swab, one
of the tubes contained a sperm fraction and the other tube contained an
epithelial fraction of the genetic material. 
She then discarded the original swabs.

E.T.
subsequently made an outcry to his aunt, Tangela Harding: E.T. described his
kidnapper as wearing a baseball hat, wearing eyeglasses, and having a short
haircut.   The house had two rooms, and
they went up some stairs to get into the house. 
The man said he was going to pull out his thing (Tangela understood E.T.
to be referring to his penis) and wanted E.T. to put it in his mouth.  When E.T. said no, the man started slapping
him.  So E.T. complied, his mouth started
hurting, and the man Awet his face.@  This outcry
was relayed to the police on February 14th.  That same day, E.T. was taken to have two
composite sketches done of his kidnapperCone with eyeglasses and one without.

Joseph Chu,
a chemist at the HPD Crime Lab, received the four tubes of DNA that had been
derived from the face swabs.  Chu=s typing of the DNA was completed on February 20th.  Chu effectively consumed the entire sample in
all four tubes during testing.[2]  He determined that the sample was a mixed
sample and that DNA patterns within the sample showed that a portion of the
sample was consistent with E.T.=s DNA.  He did
not at that time have any information regarding the identity of any other
contributor. 

On February
23rd, E.T. told Officer Shawn Valenta that the kidnapper referred to
his house as Ahis friend=s house.@  E.T.
described the house as wood frame, with about four concrete steps, and a number
A2@ on the front of the building.  Applicant was not in custody at the time E.T.
communicated this information.








Later that
day, police received a Crime Stoppers tip implicating applicant.  Sergeant Hoffmaster obtained a photograph of
applicant and compared it to the composite; he could not eliminate applicant as
a suspect based upon a comparison of the two. 
Sergeant Hoffmaster discovered that applicant had an outstanding parole
warrant and went to applicant=s house at 8602 Alsuma.[3]  The house matched the description given by
E.T.: a white wood frame home with a concrete sidewalk leading to two concrete
steps in the front and the number 2 in the address.  The address was on the mailbox and above the
door to the house.  The car parked in
front of the house was a 1982 Buick Regal, with white vinyl over dark
gray.  The interior of the car was brown
with gray.  There was no grille in the
front and there was damage around the headlights. 

Applicant
was arrested on the parole warrant at 10:00 p.m. that day.  On February 24th, the police
obtained a search warrant for applicant=s house, car, and body. Police discovered that
applicant=s house had two rooms that were in use: a living
room and a bedroom.[4]  The living room contained only one piece of
furniture: a brown sofa.  In the bedroom
was a four-poster bed with a headboard and a footboard, a television on a stand
beside the bed, and a nightstand beside the bed. On the nightstand was a bottle
of orange cocoa butter lotion.  A Houston
Oilers cannister and purple pants were also found in the house.  A dark baseball cap and a multicolored
windbreaker with dark sleeves and a purple inlay was recovered from the
vehicle.  








The next
day, Sergeant Hoffmaster recorded a videotaped lineup that included
applicant.  He also recorded a video
lineup that included applicant=s car and four other cars.  Before the video lineup of applicant was
shown, witnesses were told to view the entire videotape and see if they
recognized anyone, Aand if they didn=t
recognize anyone they should tell us that, that it was okay to do that.@  In addition,
they were told to view the entire tape before saying anything or making any
decisions.  When the suspect-lineup video
panned on applicant (in the number three position), a big smile came upon E.T.=s face, but E.T. continued to watch the rest of
video.  As soon as he was asked if he
recognized anyone, E.T. immediately pointed to applicant and said, AThat=s the man that took me to his friend=s house.@  E.T.
indicated that he was positive in his identification.  E.T. also identified applicant=s car in the vehicle lineup.   

On February
28th, Chu received applicant=s reference sample for DNA testing.  It was found to be consistent with the
remaining portion of the DNA from the face swabs. 

On March 15th,
E.T. told Officer Valenta that applicant had placed his private part in his
mouth and peed in his mouth.  When asked
what he meant by private part, E.T. pointed to his penis. 

                                                     3.
HPD=s DNA Test Results

The
following table summarizes the results obtained from Chu=s testing of the face-swab DNA contained in the four
tubes and from the victim=s and applicant=s reference samples:[5]












 
 
  
 Sample
 
 
  
 D3
 
 
  
 VWA
 
 
  
 FGA
 
 
  
 AMEL
 
 
  
 D8
 
 
  
 D21
 
 
  
 D18
 
 
  
 D5
 
 
  
 D13
 
 
  
 D7
 
 
 
 
  
 Napper
 
 
  
 16
 
 
  
 17
 
 
  
 18.2, 21
 
 
  
 XY
 
 
  
 14, 15
 
 
  
    29, 32.2
 
 
  
 16, 20
 
 
  
 10, 13
 
 
  
 11, 12
 
 
  
   8, 10
 
 
 
 
  
 Swab 
 #1
    EF
 
 
  
 15, 16
 
 
  
 17, 19
 
 
  
 19, 22
 
 
  
 XY
 
 
  
    14
 
 
  
    28, 31.2
 
 
  
 12, 18
 
 
  
 12, 13
    10
 
 
  
 11, 14
 
 
  
   8, 10
 
 
 
 
  
 Swab #1
    SF
 
 
  
 15, 16
 
 
  
 17, 19
 
 
  
   18.2, 21
 19, 22
 
 
  
 XY
 
 
  
 14, 15
 
 
  
    18, 32.2
    29
 
 
  
 16, 20
 
 
  
 12, 13
 10
 
 
  
 11, 14
    12
 
 
  
 8, 10
 
 
 
 
  
 Swab #2
    EF
 
 
  
 15, 16
 
 
  
 17, 19
 
 
  
 --
 
 
  
 XY
 
 
  
 14
 
 
  
    28, 31.2
 
 
  
 --
 
 
  
 12, 13
 
 
  
 11, 14
 
 
  
 --
 
 
 
 
  
 Swab #2
    SF
 
 
  
 15, 16
 
 
  
 17, 19
 
 
  
   18.2, 21
 19, 22
 
 
  
 XY
 
 
  
 14, 15
 
 
  
    28, 31.2
    29, 32.2
 
 
  
 12, 18
 16, 20
 
 
  
 12, 13
 10
 
 
  
 11, 14
    12
 
 
  
 8, 10
 
 
 
 
  
 Victim
 
 
  
 15, 16
 
 
  
 17, 19
 
 
  
 19, 22
 
 
  
 XY
 
 
  
 14
 
 
  
 28, 31.2
 
 
  
 12, 18
 
 
  
 12, 13
 
 
  
 11, 14
 
 
  
 8, 10
 
 




 








With
respect to the results for the four swab samples displayed in the table, the
alleles unique to applicant (possessed by applicant but not by the victim) are
displayed in bold.[6]  As can be seen from the table, the epithelial
samples did not yield particularly useful results.  One of the epithelial samples yielded results
at all ten of the loci covered by the test, matched the victim=s DNA profile at all ten loci, and matched ten
alleles from applicant that were distributed across seven loci.[7]  But only one of the alleles matching
applicant was foreign to the victim.[8]  The other epithelial sample yielded results
at only seven of the ten loci, matched the victim=s
profile at those seven loci, and matched seven alleles from applicant that were
distributed across six loci.[9]  But none of the alleles in the second
epithelial sample that matched applicant were foreign to the victim.[10]

The sperm
samples yielded far better results.  Both
samples yielded results at all ten loci. 
The first sample matched the victim=s DNA profile at nine of the ten loci, matched all
of applicant=s alleles except one, and matched eight alleles from
applicant (distributed across six loci) that were foreign to the victim.[11]  The second sample matched the victim=s applicant=s profiles in their entirety and matched nine
alleles from applicant (distributed across six loci) that were foreign to the
victim.[12]  With respect to all of the samples, all of
the alleles foreign to the victim were alleles that matched applicant=s profile.[13]








                                                            4.
Trial Preparation

On April
23, 2001, defense counsel Steven Greenlee filed a motion to preserve/motion for
independent analysis of semen and fibersCwhich included a request to hire a defense DNA
expert at county expense to conduct the independent analysis and to testify at
trial. That motion was granted.  The
prosecutors, Di Glaeser and Denise Nassar, had an open file policy and were
prepared to fully cooperate with the defense regarding matters of
discovery.  Glaeser called the HPD Crime
Lab to arrange for the delivery of DNA material for independent testing by the
defense.  Chu told her that there was no
DNA material left because it had all been used up in the HPD Crime Lab=s analysis. 
Glaeser conveyed this information to Greenlee.  After discovering that there was no DNA
material left to test, Greenlee decided not to hire a DNA expert.

At a
pretrial hearing, applicant complained that his attorney had not done any
investigation.  He claimed that Greenlee
had not disclosed to him copies of files, DNA, police reports, warrants, or
anything else.  Applicant complained that
Greenlee Ahas no experience or knowledge about DNA to question
any DNA expert officially.@  Applicant made numerous other complaints about his
attorney that we need not detail here. 
The trial judge explained that applicant was free to hire his own
attorney if he could do so, but he was not free to choose his court-appointed
counsel.

                                                                       B.
Trial

                                                                1.
State=s Case








The
evidence outlined in part A, subparts 1 and 2, of this opinion was presented at
trial.  In addition, testifying by
closed-circuit television, E.T. related the events of his kidnapping.  He testified that his kidnapper wore a purple
jacket, purple sweat pants, eyeglasses, and a blue hat.  E.T. described the car that he was pulled
into as being light brown inside.  E.T.
said that he was taken to a white, wood house with the numbers 2, 1, and 6 on
it.  He further testified that he went up
concrete stairs to get into the house. 
Inside the house was a brown couch and a black television.  E.T. said that the kidnapper tied him to the
bed, with his Afeet back@ and his Ahands in the front.@  When asked, ADid he
tie you to parts of the bed with clothes?@ E.T. answered, AYes.@  E.T.
testified that the television was on the side by the bed.  With the help of anatomically correct dolls,
E.T. testified that the kidnapper put his Aprivate@ in E.T.=s mouth.  The
kidnapper subsequently gave E.T. a bath, but did not wash his face.  The next day, the man took E.T. back to the
store where he had been abducted, and E.T. then went to Remington=s grandmother=s house.  

E.T.
testified that he had previously pointed out the man who kidnapped him on a
video lineup.  When shown photographs of
applicant=s purple jacket and pants, E.T. testified that they
looked like the ones his kidnapper had worn.  
E.T. also testified that applicant=s house and concrete steps, depicted in photographs,
looked like the place the kidnapper had taken him to, and E.T. pointed to
circles on the sidewalk that he remembered seeing.   E.T. also testified that a brown couch and a
Houston Oilers cannister that were depicted in photographs were items he had
seen in the kidnapper=s house. 
However, when the camera panned around the courtroom and E.T. was asked
to identify his assailant, he did not do so. 

The State
questioned Childs-Henry and Chu regarding their roles in subjecting the
face-swab samples to DNA analysis.  The
focus of the State=s questioning was on the semen fraction of the DNA
samples.








Childs-Henry
testified regarding her role in extracting DNA material from the face swabs for
analysis.  Although the quantity of the
sample was small, she determined that enough DNA was present for analysis.  On cross-examination, defense counsel
questioned Childs-Henry concerning the DNA extraction protocol.  Childs-Henry could not say how many steps
were in the extraction protocol that she followed.  

When asked
whether an entire DNA sample could be consumed by testing, she responded that
such a thing could happen Aif you are a sloppy chemist@ or Aif there=s not enough sample.@  When asked whether the sample was large
enough not to have been completely consumed by testing, Childs-Henry responded
affirmatively, and she responded that the sample in this case was not entirely
consumed.  ASo
there=s a DNA sample left?@
defense counsel asked.  AYes, there is,@ she responded. 
AAnd this was after Mr. Chu had done his analysis?@ defense counsel queried further.  AYes,@ Childs-Henry replied.

Chu
testified regarding his role in analyzing the DNA sample after it had been
extracted.  Chu explained that he had a
Master=s degree in Chemistry, that he completed in-house
training as well as outside agency training on DNA analysis, and that he had to
pass a proficiency test twice each year on federal guidelines.  Chu had been working eight years in the DNA
section of the HPD Crime Lab. 

Chu
testified that he conducted the STR method of DNA analysis.  He determined that the DNA was a mixture of
two individuals.  One half was consistent
with E.T.=s DNA, he explained, while the other half was
consistent with applicant=s.  AStatistically,@ the DNA results from the face swab material Amatched@ applicant. 
The odds of a random match with an individual other than applicant was
about the human population of the planet. 
Chu later testified that he could be about 99.999 percent sure that swab
sample was applicant=s DNA, or about a one-in-1.3 trillion possibility of
a random match with another individual.  
Chu also testified that he conducted a cross analysis of the DNA from
both swabs to make sure that they were consistent with each other. 








On
cross-examination, Greenlee questioned Chu regarding whether any DNA material
was left for independent analysis.  Chu
said that no evidence was left for re-analysis. AVery
unfortunately, this case it=s very small amounts,@ he
said, AI have to consume.@  Chu also testified that there were ways to
determine whether the sample was contaminated. 
There were strict guidelines in the laboratory to monitor contamination;
controls in the DNA test itself would indicate whether contamination was
present.  So, if a mistake were made, Chu
testified, it would show up.[14]  AIn this case we don=t have
any contamination in the laboratory to cause misleading results,@ he explained. 
Greenlee=s cross-examination of Chu covered approximately six
pages of the trial record.

                                                             2.
Defense=s Case

Reverend
James Ginns testified that applicant was his nephew and that he, applicant, and
applicant=s brother had keys to applicant=s residence, but applicant was the only person who
lived there on February 11th. 
Although this evidence suggested that two other persons had access to
applicant=s home, no attempt was made to implicate either of
these two individuals in the crime. 








David
Savage, applicant=s cousin, testified that applicant came to Savage=s grandmother=s house on February 11th to have Savage
work on the stereo in applicant=s car. 
Applicant arrived at the house between 10:30 and 11:00 a.m.  Savage=s grandmother lived on Newbury Street, which was in
a part of town that was close to the Southmore location from which E.T. was
abducted.  Savage testified that
applicant left between 2:30 and 3:00 p.m. 
But Parole Officer Joel Butler later testified that Savage told him that
applicant left at about 1:30 p.m.  Savage
testified that he remembered that day because he saw applicant on television
the day after E.T. was taken.  A
prosecutor would later argue to the jury that, because applicant was not a
suspect until February 23rd, Savage must have recognized applicant
on February 12th from the composite drawing.[15]  

Darlene
Savage, David Savage=s mother, said applicant left around 3:00 or 3:30
p.m., but she later said she thought he left before she did, and she left
between 2:30 and 3:30 p.m.  On
cross-examination, she said that applicant left after 2:00 p.m. and then said
she did not really remember.            Applicant=s brother, Ronnie, testified that applicant came by
his house between 3:30 and 4:00 p.m. 
Ronnie further testified that applicant was alone, and did not stay
long, because he had to go back home. 
Ronnie stated that he went over to applicant=s house about five or ten minutes later and stayed
thirty to forty-five minutes.  Ronnie did
not see a child in the house or in applicant=s
car.  Ronnie returned to applicant=s house at around 6:00 p.m., stayed for about ten
minutes, and still did not see a child in applicant=s house or car, despite the fact that he walked
through the entire house.       On cross-examination, Ronnie said that his
second visit lasted thirty to forty minutes. 
But Ronnie told Officer Valenta, in a 
February 27th conversation, that he went to applicant=s house at 5:00 p.m. on February 11th, as
was his usual routine, and that he went there only once.  Ronnie told Parole Officer Paul Ford that,
when he left applicant=s house, applicant was asleep.  Ronnie testified that he saw his brother=s car when he left for work, between 5:00 and 6:00
a.m. on February 12th, but he had told Officer Valenta that he had
seen the car at around 6:30 or 6:35 a.m. 








Against his
professional judgment, Greenlee called applicant=s
parole officers, Butler and Ford, to the witness stand because applicant
insisted that he do so.  Greenlee
discussed his reservations with the trial court, but applicant insisted that
calling these witnesses was essential to establishing an alibi by showing that
he was on electronic monitoring. 
Applicant also expressed the opinion that he would have to Acome behind@ these witnesses and testify, even though he knew
that doing so would enable the jury to learn his prior criminal record.  Applicant reiterated his prior frustrations
with his attorney, referred to what he considered to be an earlier request to
represent himself, and indicated that he personally needed to question some of
the witnesses Abecause all the facts of this case is not being
brought out by my attorney, and he will not do it himself.@ 

The parole
officers testified that applicant was on parole for rape and aggravated
rape.  Applicant was on the highest level
of supervision B the Super Intensive Supervision Program
(SISP).  This program included electronic
monitoring.  For a while, applicant was
on GPS monitoring.  At that time, only
twenty-five people in the entire state were on that kind monitoring.  Applicant was taken off GPS monitoring on
December 12, 2000, and placed a more traditional form of electronic monitoring,
which recorded only whether applicant was at home.  Applicant was required to report to his
parole officer once a week, every Wednesday. 


Under SISP,
restrictions were placed on where applicant could go and when he could be
there, and curfews were imposed.  Where
applicant could go and when he could be there depended upon the weekly schedule
made out by his parole officer.  On
February 11th, applicant was allowed to leave the house at 10:00
a.m. to go to church until noon, and then he was allowed to go to his friend
Ben=s until 5:30 p.m. 
Newbury Street was not a place that he was allowed to go that day. 








           On
February 18, 2001, a parole warrant issued against applicant for a curfew
violation.  Applicant told his parole
officer that he was delayed in getting home that day because of a flat tire,
and he showed a tire in his car with a screwdriver sticking out of it as
proof.  The warrant was in the TCIC
system, but applicant=s parole officers chose to investigate the warrant,
and a decision was later made to withdraw it, but applicant was arrested on the
warrant before it was withdrawn.

Finally,
applicant testified.  Applicant denied
having anything to do with E.T.=s abduction and sexual assault.  Applicant confirmed that he was on parole for
aggravated rape.  Applicant said that he
received permission from his parole officer to go to Newbury Street, but the
parole officer just would not admit it. 
Defense counsel asked, AYou heard Mr. Butler testify; is that correct?@  Applicant
responded, AI heard him lie, yes.@  When asked by defense counsel when he
informed Butler that he would be visiting the Newbury residence on February 11th,
applicant first responded that would have told him on the 21st, when
he visited the parole office.  When
Greenlee explained that the time frame had to be before Sunday, February 11th,
applicant responded that he gave notice the Friday before, February 9th.  Applicant further testified that he had no
regularly scheduled reporting dayChe just had to report every week.  When confronted with the fact that Ford and
Butler said it was every Wednesday, applicant retracted his earlier statement
and confirmed that he was required to report every Wednesday.  Then applicant claimed that he told Butler
about going to the Newbury address on February 7th.  When asked what his schedule was like on that
Sunday, applicant replied, AOh, it=s different times, different Sundays that I am doing
different things on different days.  What
particular Sunday are you asking me about?@  








Greenlee
further asked, AYou heard [Butler] testify that your initial
movement on Sunday was restricted to going to church, did you hear that?@  Applicant
responded, AYeah, I heard him say it, but he=s lying.  He=s lying.  He
knew I was going over there.@  Defense
counsel later asked,  AIt=s your testimony you had authority or permission to
go to Newbury?@  Applicant
replied, AThat=s true.@              Applicant also testified that there
was no damage to his car, and that the police department tore it up because
they were the only ones that had access to the car. He testified that he left
the Newbury address at around 2:30 to 2:35. 
He said that he did not go straight home because he stopped to get some
gas, and then ran by Ronnie=s house. 

When asked
whether he was familiar with the Southmore and Live Oak, Southmore-288 area,
applicant responded that he was, because he had been there in November or
December looking for his Abrother=s sister@[16] who was on drugs. 
Applicant agreed that it was a restricted area and that he was in
violation of his parole.  But then
applicant claimed that it was not a parole violation to drive through the area
so long as he was on his way to go somewhere he was allowed to go.  Applicant stated that he went to the area
many times looking for his brother=s sister.  

On cross-examination,
applicant conceded that he was in the area in October, November, and
December.  When confronted with GPS
records, applicant said that he did not know but may have been in the Southmore
area on multiple occasions at times referred to in the records, with the last
time being on December 10th. 
He said that he was taken off GPS two days later.  The prosecutor then asked, AI=m sure your parole officer will come in and tell us
that you had permission to cruise whatever area you wanted, is that correct?@ Applicant responded, AHe
probably won=t.  He won=t tell you nothing else that was the truth.@  








Applicant
said that he told his parole officer that every Sunday from the middle of
December through his arrest he was going to his friend Ben=s on Sunday after church to work on his car.  Later, the prosecutor asked, AWould you agree with me, Mr. Napper, that there were
many occasions when you would deviate from your weekly schedule and do whatever
you felt like doing?@ Applicant replied, AWell,
what=s your definition of deviate, going another
direction, or is that what you=re saying?@  Upon further
questioning, applicant agreed that he could go only to church or to Ben=s on Sunday unless he told his parole officer ahead
of time or there was an emergency.  

Applicant
admitted to normally wearing a black baseball cap.  When asked if he was taken from his residence
on February 23rd, applicant responded, AI was kidnapped. 
They didn=t have a warrant.@  With respect to whether there was body lotion
in his bedroom, applicant said that his brother had a lot of stuff there and
applicant Amight have run in his room, grabbed it, put it in
there.@  When asked
who purchased the lotion, applicant said his brother=s sister purchased it.  

Applicant
admitted that he had a prior aggravated rape conviction dated August 25, 1981,
but he claimed that he did not do it, that his attorney sold him out just like
in the present case.  Applicant also
admitted that he pled no contest to rape on September 4, 1981, but he claimed
that he did not commit that crime either. 
When asked about a rape conviction on September 13, 1979, applicant
claimed that he knew about only two rapes. 
When asked, AYou remember being placed on probation one time
before for rape?@ applicant responded, AI was
told that was dismissed or dropped.@  Applicant
admitted being convicted of indecent exposure on September 21, 1993.  He claimed that he was sitting inside his car
peeing in a can, and he said he did not think he was guilty of that offense
either.  








Applicant
acknowledged that, according to his electronic monitor, he arrived home at 3:07
p.m. on February 11, 2001.  Applicant
protested that this effectively gave him an alibi because the victim was picked
up at 3:10 p.m.  Applicant continued, AParole officers know that.  They won=t tell you all of that.  They told the news media that.  I don=t know why they won=t tell
the jury.  That=s my reason for testifying.@  

Applicant
also testified that the children did not describe his car: AIt=s not light green or red.  My car is dark.  It=s gray.  It=s not even black.@  After admitting that several of E.T.=s descriptions matched applicant=s house, applicant said, AYou didn=t even put that in the indictment, that it was at my
house. [E.T.] was taken to an apartment before he come to my house. Y=all ain=t telling the jury that.@[17]  Applicant
denied telling Butler that Ronnie spent the night at his house on February 11th.


                                                             3.
State=s Rebuttal

On
rebuttal, Sergeant Hoffmaster testified that applicant looked different at
trial than he did when Hoffmaster first encountered him.  Butler testified that applicant told him on
February 27th that Ronnie Napper came over to applicant=s house at 4:30 p.m. on February 11th and
stayed all night.  Butler also testified
that applicant never told him that he was not going to church that day or that
he wanted to go to the Savage residence. 
Butler further testified that applicant did not have permission to be at
the Newbury address, and he testified that David Savage told him that applicant
left Savage=s grandmother=s house at 1:30 p.m. 
Butler also testified that applicant had been instructed to take the
most direct route to his destination and was not authorized to travel around
the Live Oak and Calumet area for 30 minutes. 


Finally,
Butler testified that applicant told him that he did not do it.  Butler replied that if applicant did not do
it, then DNA ought to show that he did not do it.  Applicant responded, AWell if it does, they are just setting me up.@








                                                       4.
Verdict and Judgment

The jury
found applicant guilty of aggravated sexual assault and aggravated
kidnapping.  At punishment, applicant
testified and continued to maintain his innocence.  After defense counsel completed his
questioning of applicant, applicant stated, AYou
sold me out Greenlee.@  Greenlee
then rested the defense, and applicant stated, AI didn=t do it.  I
swear I didn=t do this.@  While the
jury was in recess, applicant stated, AThey framed me in this case.  I will fight it the rest of my life.  They framed me.@  When the jury was brought in, applicant
further stated, AY=all going to pay me. 
Fed investigation, as soon as I get a chance y=all going to pay me. 
As soon as I can there=s going to be a fed investigation.@  Finding that
applicant had committed two prior sex-related felonies, the jury sentenced
applicant to an automatic life sentence.[18]  When asked whether he had anything to say
before the trial judge pronounced sentence, applicant replied, AWhen they frame your family, remember me.  That=s all I have to say.@

                                                                  C.
After Trial

                                                         1.
Motion for New Trial








Applicant
gave notice of appeal, and the trial court appointed Bob Wicoff as appellate
counsel.  Wicoff filed a motion for new
trial on applicant=s behalf, claiming that applicant was denied his
right to represent himself at trial and that he received ineffective assistance
of counsel.             In connection with the motion, applicant submitted an
unsworn declaration in compliance with the Texas Civil Practices and Remedies
Code.[19]  Among other things, applicant pointed out
that, although Greenlee elicited testimony from applicant=s parole officers that applicant was on electronic
monitoring on February 11, 2001, Greenlee failed to elicit any testimony from
them that the electronic monitoring confirmed applicant=s presence at home at 3:07 p.m.  Applicant stated that this was the reason
that he had wanted to call these witnesses and that the failure to elicit this
information forced him to take the stand to testify about the matter.  Wicoff also submitted an affidavit from
Butler, who expressed surprise at the fact that Greenlee failed to elicit this
information from himCleading Butler to wonder why defense counsel chose
to call him as a witness. 

Wicoff also
filed a motion to hire a DNA expert at county expense, which was granted.  Wicoff later submitted an affidavit from Dr.
Elizabeth Johnson, a forensic DNA expert who had developed some widely utilized
DNA analysis techniques.

Dr. Johnson
concluded that the testimony of Childs-Henry and Chu reflected Aa lack of understanding@ on their part Aas to some of the fundamental aspects of body fluid
identification, DNA extraction and typing as well as interpretation of results.@   Dr. Johnson
further stated that she had reviewed numerous HPD Crime Lab cases in which
these individuals performed analyses and she had detected serious errors in
most of these cases, including the Aunnecessary consumption of the evidence due to poor
extraction protocols and techniques . . . and erroneous interpretation of data.@  She also
stated that re-testing was a critical part of the evaluation of a criminal case
involving DNA evidence and a necessary part of preparing an adequate
defense.  ABecause
DNA evidence can have a tremendous impact on the outcome of a criminal case,@ she explained, Ait is
generally accepted in the relevant scientific community that re-testing needs
to be performed whenever the evidence permits this.@  Dr. Johnson
cited a National Research Council (NRC) recommendation that Awhenever feasible, investigative agencies and
testing laboratories should provide for repeat testing.@








Dr. Johnson
further observed that, in this case, Aas in many other cases I have reviewed involving the
Houston PD lab, the lab apparently consumed all of the critical evidence . . .
without notifying the prosecution of their intent to do so.@  She
explained that A[m]any laboratories@ with
which she was familiar would Anot consume limited samples without notification so
that defense counsel can have the opportunity to have the testing observed if
duplicate testing is not possible.@ 








Although
re-testing was not possible, Dr. Johnson stated that a qualified expert should
have reviewed the bench notes from the HPD Crime Lab to determine whether Aan error in the analysis was documented or if the
data obtained were interpreted and testified to correctly.@  Dr. Johnson
identified numerous questions that defense counsel should have asked
Childs-Henry and Chu, including Awhat were the relative proportions of major and
minor DNA contributors and the corresponding peak heights@ and whether there could be an Aalternative interpretation of the mixed DNA profiles
other than the approach utilized by Mr. Chu in which he determines the DNA
profiles in the evidence based on his knowledge of the victim=s and defendant=s reference DNA profiles@ and Awhether it was appropriate of Mr. Chu to isolate the
defendant=s profile out of a mixture and report the frequency
of the defendant=s DNA profile rather than calculating the combined
frequency of all possible donors to the mixed DNA profile obtained from the
evidence.@  Based upon a
study conducted in Connecticut, Dr. Johnson further explained that mixed
samples were especially difficult to interpret and that Aoften an analyst will >see= a particular individual=s profile in a mixture by comparing it to a
defendant=s or victim=s profile and perform a biased analysis.  This type of biased analysis does not
consider that the evidence profile in a mixed sample could be the result of the
profiles of individuals other than the defendant and the victim.@  Dr. Johnson
stated that this information was a subject that should have been brought out in
cross-examination.  Dr. Johnson also
criticized defense counsel for failing to cross-examine the witnesses regarding
the NRC recommendation or the practice of many laboratories to provide for
repeat testing.

Dr. Johnson
concluded that the expert testimony from Childs-Henry and Chu was Asome of the most poorly presented and cross-examined
testimony that I have ever reviewed.@  She found
that Greenlee=s Alack of knowledge . . . in the area of serology and
DNA typing is apparent through his extremely cursory and superficial cross
examination.@ 

The State
submitted an affidavit from Greenlee. 
After Greenlee became aware that there was no DNA left to test, and
after consulting with other attorneys, he decided Athat the only purpose that an expert would serve
would be to review the procedures and methodologies used in the analysis by the
State=s experts.@  Greenlee
believed that he Acould effectively argue the unfairness of no sample
being available to the defense to analyze@ without the help of an expert.  He further believed that, Aif there were some issues with regard to methodologies
and procedures,@ he Acould get more mileage out of this on
cross-examination.@  He also
feared Athe distinct possibility that our expert would
confirm the propriety of the State=s methodologies and procedures during the laboratory
testing, thereby reinforcing the validity of the DNA results.@  Greenlee
believed that he had effectively cross-examined the witnesses involved in the
DNA collection and testing.








With
respect to the testimony of the parole officers, Greenlee said that applicant
believed that they would testify that there was not a valid parole warrant in
effect at the time of his arrest. 
Greenlee had counseled against calling the parole officers, but
applicant had insisted that they be called. 
Greenlee further stated that he did not spend much time on applicant=s time of arrival at home on February 11th
because Ait would not eliminate [applicant] as being capable
of committing the offenses alleged.@  This was so
because applicant was Ain an area not too far from the kidnapping@ that day and because intervening circumstances that
took place prior to the police being called would have given applicant Amore than enough time to travel from the kidnapping
scene to his residence.@  Defense
counsel believed that the weakest areas of the State=s case were the DNA testing procedures and the
victim=s inability to identify applicant in the
courtroom.  Greenlee believed that, if
jury were inclined to find guilt despite those weaknesses in the State=s case, then they were not going to find the time of
applicant=s arrival at home to be significant.

Greenlee
also stated that applicant was very demanding and uncooperative, and he
repeatedly failed to take Greenlee=s advice. 
Finally, Greenlee pointed out that he used an investigator, filed many
motions on applicant=s behalf, reviewed reports, and spoke to witnesses.

                                                                     2.
Appeal

The trial
court denied the motion for new trial, and applicant appealed.  The sole issues on appeal were claims of
ineffective assistance of counsel. 
Applicant claimed that Greenlee was ineffective because: (1) he did not
elicit testimony from applicant=s parole officers regarding the fact that the electronic
monitoring system had indicated that applicant had returned home at 3:07 p.m.,
(2) he elicited damaging testimony from his parole officers regarding his prior
convictions and details of his previous level of surveillance while on parole,
and (3) trial counsel=s performance was deficient with respect to the DNA
evidence. 








The court
of appeals affirmed.[20]  With respect to the electronic monitoring
allegation, the court responded that applicant was not prejudiced because the
State elicited the 3:07 p.m.-arrival information during its cross-examination
of applicant.[21]  The court of appeals also found that
applicant=s 3:07 p.m. arrival time did not necessarily exclude
him from being the kidnapper.[22]  Regarding the allegation about the testimony
of the parole officers, the court of appeals found that applicant had insisted
on calling these witnesses after being warned of the potential dangers and that
defense counsel was not unreasonable in addressing, on direct examination,
unfavorable facts that Amost likely would have been addressed by the
prosecutors on cross-examination.@[23]  Finally,
with respect to the allegations regarding DNA evidence, the court of appeals
concluded that Dr. Johnson=s affidavit did Anot
allege any actual errors in Childs-Henry=s or Chu=s work which trial counsel failed to discover or
develop.@[24]  The
appellate court also pointed to defense counsel=s
cross-examination of police officers regarding how the facial swabs were
handled prior to the HPD Crime Lab=s receipt of the evidence and to defense counsel=s emphasis on the fact that no sample remained for
applicant to test independently.[25]


A petition
for discretionary review was subsequently filed and refused. 

                                                           3.
Additional Testing








In November
of 2002, adverse publicity began to arise about the condition and practices of
the HPD Crime Lab.[26]  Within a month, the acting Chief of Police
commissioned an outside review of the lab=s DNA/Serology section.[27]  Based upon a preliminary oral report of the
auditors, HPD suspended the performance of all DNA analysis at the Crime Lab.[28]  In 2003, HPD and the Harris County District
Attorney=s Office began identifying cases in which some form
of DNA analysis had been performed by the lab.[29]  AThis process evolved into a long‑term re‑testing
project coordinated among HPD, the District Attorney=s Office, and outside DNA laboratories.@[30]  

One of the
cases identified in this process was applicant=s.  The seemingly empty tubes that had contained
DNA from the face swabs were forwarded by the HPD Crime Lab to ReliaGene
Technologies.  The lab also forwarded
what purported to be reference samples from E.T. and applicant.  ReliaGene used a buffer solution to
re-suspend any DNA residue that might be left in the tubes, and it tested the
DNA at fourteen genetic loci, including the original ten loci tested by
Chu.  Of the four tubes of DNA from the
face swabs, only one tubeCcontaining the epithelial fraction from one of the
face swabsCproduced any results.  

In May of
2004, ReliaGene reported that the major component of the DNA was not consistent
with E.T. or applicant, while the minor component contained two weak alleles
that were consistent with applicant. 
These two weak alleles were found in the additional loci not tested by
Chu.  After these results, it was
determined that the tube purporting to contain E.T.=s reference sample was not the correct tube.  On June 30, 2004, after a new reference
sample was procured from E.T. and analyzed, ReliaGene concluded that the major
component of the face-swab DNA was indeed consistent with E.T.=s DNA.  The
conclusion with respect to the two weak alleles matching applicant was
unchanged.  No other DNA alleles foreign
to E.T. were detected in the sample.








In an
affidavit later obtained in habeas corpus proceedings, Gina Pineda, Assistant
Director at ReliaGene, explained that she did not believe that the DNA extracts
received by ReliaGene were quantitatively the same as those tested by the HPD
Crime Lab.  Consequently, she would
expect ReliaGene to detect fewer alleles in its analysis, but for the results
to remain consistent with what the HPD Crime Lab had found.  Her examination of the data indicated that,
indeed, the results obtained by the two testing laboratories were Anot discrepant.@  She also
expected that, if a third round of testing were performed, there would be a
further progressive loss of alleles. 
Some of the victim=s alleles might also become lost and Asome allele drop-in may also be observed.@

In an
August 2004 newspaper article, assistant district attorney Marie Munier was
quoted as saying about the ReliaGene results, AYou
can=t even do a statistical analysis (on the probability
that the DNA was Napper=s).  I don=t know what it would be, but it wouldn=t be very much.@[31]

In 2005,
during the instant habeas proceedings, the parties agreed to more testing, by
Orchid Cellmark.  They acknowledged in
writing that the testing was expected to consume all of the evidence and agreed
to waive the opportunity to have a representative observe or participate in the
testing.

In June of
2005, Orchid Cellmark reported that it was able to obtain results for the
face-swab tubes containing the epithelial fractions of DNA but was unable to
obtain results for the tubes containing the sperm fractions.  The samples were analyzed at sixteen
different loci, including the ten loci tested by Chu and the four additional
loci tested by ReliaGene.  The samples
for both epithelial-fraction tubes were mixtures.  








For one of
the epithelial samples, Orchid Cellmark determined that the major profile
matched the victim, and the suspect could not be excluded as a possible donor
of the minor alleles in the mixture. 
Four alleles foreign to the victim were found (across four different
loci), all of which matched applicant=s DNA profile. 
One of these alleles was found at a locus that had been tested by both
HPD and ReliaGene but had not previously been found there.  One of the alleles was confirmed at one of
the new loci that had been tested by ReliaGene. 
The other two alleles were found at new loci tested only by Orchid
Cellmark.    

Orchid
Cellmark determined that the other epithelial sample was a mixture of DNA from
the victim and an unknown individual. 
Five alleles foreign to both the victim and applicant were found, and
two loci yielded inconclusive results. 
In subsequent testing, Orchid Cellmark was able to exclude as possible
contributors to the foreign alleles A.G. Riddle, C. West, J. Chu, J.W. Belk,
L.R. Verbitskey, M. Childs-Henry, and R. Hilleman.

Orchid
Cellmark provided statistical frequency calculations for the epithelial sample
that contained the four alleles that matched applicant=s DNA profile. 
According to Orchid Cellmark, the approximate frequencies for unrelated
individuals for all possible types included in the mixture, making no
assumptions regarding the number of DNA sources, are 1 in 255 for
African-Americans, 1 in 3,427 for Caucasians, and 1 in 585 for Hispanics.

                                                           4.
Bromwich Report








As a result
of problems discovered with the HPD Crime Lab, a team headed by Michael R.
Bromwich was chosen to further investigate and evaluate the Crime Lab=s practices, both past and present.  The report, published on June 13, 2007,
contained numerous scathing criticisms of the Crime Lab=s serology/DNA section.  AOn the whole,@ the serology/DNA section=s Awork did not meet the generally accepted forensic
science principles that existed at the time and posed major risks of
contributing to miscarriages of justice in extremely significant cases.@[32]








           Bromwich
attributed this failure to budgetary problems, incompetent leadership, and lack
of training for the DNA analysts.  A[U]ntil the public crisis engulfed the Crime Lab, it
was never provided adequate financial support to hire and train the number of
criminalists necessary to handle the Lab=s ever-increasing workload.@[33]  The DNA
section was in AshamblesCplagued by a leaky roof, operating for years without
a line supervisor, overseen by a technical leader who had no personal experience
performing DNA analysis and who lacked the qualifications required under the
applicable Federal Bureau of Investigation (>FBI=) standards, [and] staffed by underpaid and undertrained
analysts.@[34]  Training was
one of the first areas in which funding was cut when the HPD Crime Lab=s budget became tight.[35]  The lab was populated by civilian, as opposed
to law enforcement, employees, and as such, was marginalized within HPD.[36]  Until the 2002 audit, the HPD Crime Lab did
not submit to reviews by outside agencies and never sought to achieve
accreditation.[37]  As a result, HPD=s analysts became isolated from the rest of the
forensic science community.[38]  Although the person with supervisory control
over the DNA section certified that internal audits conforming to FBI quality
assurance standards found that those standards were met, the outside audit
found to the contrary.[39]  

Bromwich
characterized the HPD DNA analysts as Awoefully undertrained.@[40]  AThe problems we observed in the historical DNA
cases,@ he further explained, Aare not attributable to individual rogue analysts
who departed from the Crime Lab=s approved practices.  On the contrary, the widespread and serious
deficiencies in the historical Crime Lab were consistent with the Crime Lab=s accepted and understood practices.@[41] 
Consequently, A[f]lawed practices and embedded misunderstandings .
. . became accepted by analysts within the DNA/Serology Section as the correct
way of doing things.  These
misunderstandings infected the work of the Section=s analysts from the analysis through the trial
testimony.@[42]  Bromwich
found Athe same types of major issues across all the Crime
Lab=s DNA work, regardless of the analyst or the DNA
typing system used.@[43]








One of the
cases that Bromwich reviewed was applicant=s.  Bromwich
criticized Childs-Henry for failing to properly document the procedures she
used and for failing to use some of the more definitive procedures for
detecting and confirming the presence of semen.[44]  With respect to Chu=s testing, Bromwich found that the Aoriginal DNA testing appears to have generated good
quality and clear results from potentially very difficult forensic evidence
samples.@[45]  The Aoverall assessment@ of
Chu=s testing was that Ahe
developed clean, interpretable profiles from the four evidence samples he
tested.@[46]  








But,
according to Bromwich, applicant=s case Aillustrates two significant problems with the Lab=s historical DNA work.  First, the Crime Lab analysts utilized all of
the readily testable sample in this case,@ and second, Chu used an inappropriate statistical
analysis of the random match probability.[47]  Regarding the first problem, Bromwich found
that Ait was unnecessary and inappropriate for Mr. Chu to
have tested the extracts from both swabs, thereby consuming the available
sample in this case.@[48]  Although Chu
stated in an affidavit in the instant habeas proceedings that he did not Aconsume all of the extract in this case out of
carelessness or out of a desire to prevent additional testing,@ Bromwich concluded that Athere was no need, and it was a mistake, for him to
consume both of the redundant >face-cheek= swabs.@[49]  Doing so was
Athe product of very poor laboratory practice.@[50]  This Amisstep@ was compounded by the fact that Childs-Henry had Adiscarded the tubes containing the raw evidence (the
swabs) after she performed the DNA extractions.@[51]  And while Aoutside laboratories have been able to obtain some
results@CAmixed results@Cfrom testing the unseen residue in the tubes, those
results Ado not approach the strength@ of AChu=s original results.@[52]  Notably, the
Bromwich Report observed, ANeither laboratory has been able to confirm the
alleles consistent with Mr. Napper=s DNA profile that Mr. Chu detected in the sperm
fractions of each of the swabs, which captured most of the consistency between
evidence profiles and Mr. Napper=s DNA profiles.@[53]

Turning to
Chu=s statistical analysis, Bromwich initially
criticized statements made by Chu in a March 30, 2001 report.[54]  There, Chu characterized the DNA material as
a Amixture@ consistent with the victim and with applicant.[55]  Chu went on to state, AGiven the population on the face of the earth and
eliminating the probability of identical twins, the DNA profile statistically
matches only Lawrence Napper.@[56]  Bromwich
criticized these statements as Acontradictory@ and called Chu=s statistical statement Aincorrect and misleading.@[57]  








Further,
Bromwich=s examination of Chu=s file
revealed that Chu had based his statistical calculation of the random match
probability upon applicant=s known profile, Awhich
was the usualCand extremely flawedCpractice
in the Crime Lab.@[58]  In another
portion of his report, Bromwich explained that, while calculating the random
match probability of a single DNA profile was Arelatively
simple and straightforward@ and can Aprovide the most discriminating information about
whether a particular individual could be the source of the biological evidence,@ the same could not be said of a mixed sample
containing DNA from more than one person.[59]  When a DNA profile contains DNA from more
than one person, Ait is much more difficult to provide compelling
statistical evidence that a particular person=s DNA
was found in an evidence sample.@[60]  Random match
probabilities related to a mixture Amay result in frequency estimates that indicate that
a relatively large proportion of the human population could have contributed to
the biological evidence.@[61]  A frequency
estimate based upon a suspect=s known reference sample Ais completely irrelevant to the strength of the DNA
evidence when the DNA profile is a mixture.@[62] 
Nevertheless, despite the inappropriateness of calculating a random
match probability using a defendant=s known profile, Athe
Crime Lab virtually always calculated its reported frequency estimates@ in this fashion.[63]








When
setting out an allelic table, Bromwich bolded the alleles that were unique to
applicant=s profile (matching applicant but foreign to the
victim),[64]
indicating that it was those unique alleles from which a random match
probability must be calculated.  Based on
Chu=s STR data, Bromwich calculated the accurate random
match probability as A1 in 232,000 in the African American population, 1
in 1,920,000 in the Caucasian population, and 1 in 7,430,000 in the Hispanic
population.@[65]  He
characterized these statistics as Arelatively strong results given the nature of the
sample in this case,@ but Aa far cry from the sole source, unique match that
Mr. Chu reported.@[66]

                                                                     5.
Habeas

Wicoff
filed a habeas application on applicant=s behalf.  In
addition to the evidence above, the habeas court obtained affidavits from
Glaeser, Greenlee, Childs-Henry, Chu, and Johnson.  Applicant submitted affidavits from two
attorneysBCunningham and Downey.  The court conducted an evidentiary hearing,
at which Greenlee testified.  And the
habeas court received various pieces of documentary evidence.

The facts
conveyed by Glaeser=s affidavit have already been discussed.  

In his
affidavit, Greenlee stated that applicant=s response to the criminal charges Awas an adamant denial of the charge.@  Before
trial, Greenlee believed there would be three main pieces of evidence at trial:
DNA evidence, evidence relating to the bottle of orange lotion, and evidence
relating to applicant=s electronic monitoring.  Greenlee believed he had effectively shown on
cross-examination that there was not a clear set of procedures, methodologies,
and practices regarding how the DNA material was analyzed.








In her
affidavit, Childs-Henry stated that she Adid not observe the vials of extract after they were
transferred to Chu@ and had Ano way of knowing what amount of liquid, if any,
actually remained in the vials once Chu had completed his analysis.@  Realizing
that this statement conflicted with her trial testimony, Childs-Henry explained
that she had trained under the RFLP variant of DNA analysis and was unfamiliar
with the STR procedure at the time of trial. 
She had just assumed there would be sample left based on her RFLP
training because there was generally sample left after RFLP testing.  After reviewing her trial testimony,
Childs-Henry stated that she realized that the defense attorney was asking
whether she knew for a fact that liquid DNA extract still existed and that, in
reading over her answers, she could only assume that, while she was being
cross-examined by defense counsel, she Adid not understand the intent behind his
questioning.@  She further
stated that it was not her intent to be misleading or untruthful but that her
statement that there was DNA sample left was Aunintentionally
incorrect.@ 

Chu=s affidavit contained his statement, recounted
above, that his consumption of all of the DNA material was not from
carelessness or a desire to prevent additional testing.  He said he did not expect to be able to
develop a profile from the sample because the concentration of DNA was so
low.  He also stated that in such cases,
it is not uncommon to consume all of the liquid extract in testing.  He also said that, when asked whether there
was any DNA left to test, he interpreted the question, under Athe common language and words of art used in our
lab,@ to mean whether there was any liquid extract
remainingCnot whether it was possible to obtain DNA test
results from residue that might have been left in the tubes.  His statement to Glaeser and his subsequent
testimony at trial accorded with that understanding and was not an attempt to
hide or withhold anything from the defense.








Dr. Johnson=s affidavit responded to the DNA test results from
ReliaGene.  She believed that the two
alleles that matched applicant=s DNA had to be analyzed separately for the purpose
of establishing a random match probability. 
One of the alleles was present in 14.5 percent of African-Americans,
16.5 percent of Caucasians, and 10.29 percent of Hispanics.  The other allele was present in 30 percent of
African-Americans, 32.5 percent of Caucasians, and 39.23 percent of
Hispanics.  She also expressed dismay at
HPD=s initial error in forwarding an incorrect reference
sample to ReliaGene.  AThis type of serious error is typical of the work
performed at the HPD lab based on my review of many cases,@ she said, Aand it calls into question the validity and
reliability of re-testing any DNA that was originally extracted by the HPD lab.@  She stated
that it was Ahighly likely given the sloppy work performed by
HPD, that even if the foreign alleles detected in the face swab extract
originated from Mr. Napper=s DNA, that it could be a result of contamination
within the HPD lab.@

Dr. Johnson
also criticized the statistical frequency estimate offered by Chu at trial
(that the DNA from the swabs statistically matched applicant=s profile). 
She contended that the estimate was Acompletely
unsupported scientifically@ and was Apatently false.@  She further
stated that a Amixture of DNA cannot possibly statistically match
only one person@ and Aattempts to discern the individual profiles in a
mixture of DNA is very difficult.@  








In his
affidavit, Cunningham opined that Greenlee=s cross-examination of Chu was Ainadequate@ and Ademonstrated the dangers of trying to question an
expert if you have no training in his area of expertise.@  Cunningham
faulted Greenlee for failing to hire a consulting expert.  Cunningham believed that a consulting expert
was necessary to help defense counsel understand the subject better, to shed
light on the statistical calculation made by Chu, and to enable defense counsel
to know what to request during discoveryCe.g., bench notes, worksheets, and other documents
used by the State=s expert during testing.  Cunningham also believed that a consulting
expert would have reached the same conclusion as Bromwich regarding the
inappropriateness of consuming all of the evidence.  In addition, Cunningham opined that a
testifying expert Acan always make more headway@ with regard to criticizing another expert=s testimony than counsel can through
cross-examination.  Cunningham also
stated that, when Childs-Henry testified at trial that some DNA sample still
existed, defense counsel should have moved for a continuance to have testing
done by his own expert.  Cunningham also
said that the HPD Crime Lab should have notified the prosecutor=s office before conducting testing that testing
would consume all of the evidence.  This
would allow the prosecutor=s office to alert the defense, who could have had an
expert present at testing, or have the samples separated for independent
testing.  When faced with the HPD Crime
Lab=s failure to have done so, Cunningham would have
filed a motion to suppress the DNA results. 

Downey=s affidavit stated that DNA Ais an extremely difficult area of science to simply
self-teach.@  He believed
that an attorney with no prior experience with DNA analysis acts deficiently by
failing to enlist the help of a consulting expert.  He stated that a consulting expert could have
helped defense counsel understand the proper standards of testing and provide
valuable impeachment if the State=s expert did not take the proper measures.  He made the same points as Cunningham
regarding the usefulness of a consulting expert with respect to the State
expert=s statistical analysis and with respect to
discovery, and he also believed that Greenlee should have moved for a
continuance after Childs-Henry=s testimony. 
Like Cunningham, he believed that the HPD Crime Lab should have notified
the prosecutor=s office before conducting the testing and that
reasonably competent counsel would have moved to suppress the DNA results. 

At the
evidentiary hearing, Greenlee testified that the State had a compelling case
without the DNA evidence.  Greenlee saw
three Alinkages@ between applicant and the crime: (1) DNA, (2) E.T.=s description of applicant=s house, Awhich was on point,@ and
(3) the Aunique orange lotion@ found
in the house.  Nevertheless, Napper=s defense was that he did not do it.  








When asked
about his prior experience, Greenlee acknowledged that he had no degree in the
field of forensic training and that, before applicant=s trial, he had never taken any continuing legal
education classes on DNA, had never presented a DNA expert as a witness, and
had never cross-examined a DNA expert. When asked whether he had ever used a
consulting expert, Greenlee said, AWell, I don=t differentiate between consulting and using them as
an expert witness.  If I=m going to call somebody as an expert witness, I=m going to consult them. . . . From a semantic
standpoint, it seems to me they=re the same kind of person.@  When asked, A[I]f the State were relying on the testimony of an
expert in an area that you were totally unfamiliar with, might you call someone
to educate yourself through that expert so that you could more effectively
handle the State=s case yourself,@
Greenlee responded, ANot necessarily, because I can read.@ After Greenlee had discussed securing literature on
fingerprint analysis as an example of self-teaching, Wicoff  asked if DNA was more complex than
fingerprints.  Greenlee answered, AI=m not equipped to make that distinction.@  When asked if he thought he could obtain Alab notes or worksheets or electronic data from DNA
testing@ through discovery, defense counsel replied that he
believed that worksheets and lab notes would be protected by the work-product
privilege, but electronic data should be available.  When asked if he received an
electropherogram, defense counsel said, ANo,@ but he Asaw a breakout of all of the alleles.@  When asked
if he saw an allelic table, defense counsel said, AI believe I did,@ but
then stated, Ait=s been eight years,@ when
Wicoff pointed out that AHPD doesn=t do allelic tables.@








Greenlee
also stated that he did not think he needed prior training with respect to
reading the DNA information because it was Arelatively
straightforward.@  When asked
whether a testifying expert would have enhanced his strategy of emphasizing the
unfairness of not having DNA available for testing by the defense, Greenlee
said, ANot necessarily,@
because the expert testimony might have been unfavorable, and he did not have
the benefit of hindsight.  ABecause,@ Wicoff asked, Ayou never checked with a consulting expert?@  Greenlee
said that he Adidn=t feel the need to.@

When asked why
he did not obtain testing after Childs-Henry testified that some DNA sample
remained, Greenlee said that they later learned that Childs-Henry Awas simply mistaken.@  When asked what he understood by the
statement that no material was left for analysis, Greenlee replied, AThat whatever material was taken from the little boy
. . . there was nothing left for me to conduct an independent analysis on.@

Greenlee
also testified that he thought the defense was helped by Childs-Henry=s testimony that a Asloppy
chemist@ would consume the entire sample.  And he testified that the defense was
seriously hurt by applicant=s own testimony, that the damage caused by that
outweighed the DNA evidence and was the Adeciding factor@ in the case.

The habeas
record also contains documents from the FBI and the National Research Council
(NRC) regarding standards for DNA testing. 
In the FBI document, Standard 7.2 states: AWhere
possible, the laboratory should retain or return a portion of the evidence
sample or extract.@[67]  The NRC=s Recommendation 3.3 states: 

Whenever feasible, forensic
samples should be divided into two or more parts at the earliest practicable
stage and the unused parts retained to permit additional tests.  The used and saved portions should be stored
and handled separately.  Any additional
tests should be performed independently of the first by personnel not involved
in the first test and preferably in a different laboratory.[68]

 








In the
commentary, the NRC states, AWe recognize that no amount of care and proficiency
testing can eliminate the possibility of error. 
However, duplicate tests, performed as independently as possible, can
reduce the risk of error enormously.  The
best protection that an innocent suspect has against an error that could lead
to a false conviction is the opportunity for an independent retest.@[69]

                                                                  II.
ANALYSIS

In habeas corpus proceedings, this Court is the ultimate factfinder,
but we usually defer to the habeas court=s fact findings if they are supported by the record.[70]  With this standard of review in mind, we turn
to the three claims upon which we filed and set this application. 

                                                          A.
Youngblood Claim

                      1. The Parties= Arguments and the Habeas Court=s Findings

Applicant contends that Chu and Childs-Henry Aintentionally, recklessly, and in bad faith consumed
and destroyed available evidence.@  He notes the
Bromwich Report=s criticism of Chu for effectively consuming the
entire sample and of Childs-Henry for discarding the original swabs.  

The habeas court recommends that relief be granted on this ground under
Arizona v. Youngblood[71]
and Illinois v. Fisher.[72]  Under those cases, the court concludes that a
defendant is entitled to relief if it is shown that State acted in bad faith in
destroying potentially useful evidence.








The habeas court concludes that the DNA material in this case
constituted Apotentially useful evidence@ because the DNA test results might have exonerated
applicant.  Citing Professors Dix and
Dawson, the court says that showing bad faith requires establishing that Alaw enforcement officials were actually aware their
action or inaction would result in the loss of what they recognized would be
evidence.@[73]  Under this
standard, the court concludes that the lab workers acted in bad faith.           In
support of its conclusion, the habeas court cites three items.  First, it contends that Article 38.39 of the
Texas Code of Criminal Procedure (requiring the preservation of evidence
containing biological material) had already been enacted and was to take effect
on April 5, 2001.  The court further
states that Ait does not make sense, nor does this Court find it
to be credible, that employees of the Houston Police Department Crime Lab would
have been unaware of the statute which was about to take effect, or that they
would not have fully realized that the evidence that they were testing
precisely fit what the statute so obviously sought to preserve.@  Second, the
court points to FBI and NRC standards that call for retaining a portion of DNA
evidence for re-testing, if possible. 
Finally, the court states that it was the Acustomary
practice in the criminal district courts of Harris County . . . that where
there is danger of evidence being consumed in testing . . . for a forensic lab
to alert the prosecutor, who may then alert both the defense counsel and the
trial court . . . and obtain an acknowledgment signed by all parties that
consumption of the evidence may occur.@  As an
example, the court cites AAppendix 4@ as showing how this practice was followed by the
Orchid Cellmark Lab during the instant habeas proceedings.[74]









We asked the parties to submit briefs concerning whether the DNA
samples that were destroyed constituted Apotentially useful evidence@ under Youngblood.  Relying upon Fisher, applicant
contends that the Supreme Court=s definition of Apotentially
useful evidence@ is broad, applying even if the potential for
exculpatory results is low.[75]  Applicant also argues that further testing
has provided results that are actually exculpatory, showing that the link
between applicant and the DNA material is Aalmost non-existent.@  He supports this argument with the following
claims: (1) that assistant district attorney Munier concluded that the
statistical link to applicant in this case Awouldn=t be very much,@ (2) that ReliaGene=s
report observed that only two out of fourteen loci revealed a link to applicant
and the two matches were Aweakly detected,@ (3)
that Orchid Cellmark concluded that the DNA profile obtained from Athe epithelial fraction of the tubes of DNA extract@ was a mixture of DNA from the victim and an unknown
individual, and (4) that Orchid Cellmark=s statistical analysis was that 1 in 255 individuals
could be the source of the DNA profile developed from the epithelial
fraction.  Applicant asks, A[I]f accurate testing was not possible at ReliaGene
due to the diminished state of the DNA extract, then how were they able to obtain
a full DNA profile from such evidence?@  Applicant
contends that the State cannot dismiss the re-testing as unreliable with
respect to applicant when it produced a full genetic profile for the victim.

The State contends that the DNA samples were not potentially useful
because subsequent testing results (by both ReliaGene and Orchid Cellmark)
include applicant as a possible donor of the genetic material.  The State claims that the difference between
Chu=s results and the results obtained in re-testing
involved the number of alleles detected and could be readily explained by the
quantitative difference in the samples compared.  Consequently, the State contends, the evidence
consumed by the HPD Crime Lab was not potentially useful because further
testing of the remnants of that evidence continues to affirm applicant=s guilt.








Some of the habeas court=s findings may be relevant to whether the DNA
samples were potentially useful.  In
finding 37, the court recites Orchid Cellmark=s
conclusion that applicant Acannot be excluded as a possible donor of the minor
alleles in the mixture,@ as Ameaning that, as with ReliaGene=s testing, there was only a weak link to Napper in
the epithelial fraction of one of the face/cheek swabs.@  In finding
38, the habeas court recites Orchid Cellmark=s
conclusion that the ADNA profile obtained from the epithelial fraction of
the tubes of DNA extract . . . is a mixture, including the victim and an
unknown individual@ as meaning that Athe
link to Napper was so weak that the other contributor to the epithelial
fraction was labeled >an unknown individual.=@

                                                        2.
Preservation of Error

Ordinarily, a defendant is barred from raising a claim on habeas corpus
if he could have raised the claim at trial and on direct appeal, but did not.[76]  Although applicant was aware that the DNA
material had been consumed during testing, he raised no Youngblood complaint
at trial or on direct appeal.  Trial
counsel Greenlee did not know that consuming the entire DNA sample was
improper, but that fact could have been discovered at the time of trial.  However, some facts that are potentially
relevant to the claim arose after trial: public discovery of the
extensive problems with the HPD Crime Lab and the subsequent DNA testing
conducted by ReliaGene and Orchid Cellmark. 
In his habeas application, applicant also claims that Greenlee=s failure to move for suppression of the DNA test
results on the basis of HPD=s consumption of the DNA sample constituted
ineffective assistance of counsel.  Under
these circumstances, we find it appropriate to address the merits of applicant=s Youngblood claim without first addressing
the question of procedural default.

                                                                    3.
The Law








                                                        a.
Supreme Court Cases








In Youngblood, the defendant complained about the State of
Arizona=s failure to preserve semen samples from the victim=s body and clothing.[77]  Noting that the State=s good or bad faith is irrelevant when the State
fails to disclose exculpatory evidence, the Supreme Court nevertheless held
that a different standard applies Awhen we deal with the failure of the State to
preserve evidentiary material of which no more can be said than that it could
have been subjected to tests, the results of which might have exonerated the
defendant.@[78]  Quoting California
v. Trombetta,[79]
the Supreme Court concluded that different treatment was justified in part
because A[w]henever potentially exculpatory evidence is
permanently lost, courts face the treacherous task of divining the import of
materials whose contents are unknown and, very often, disputed.@[80] 
Consequently, when the destruction of potentially useful evidence is at
issue, the defendant must show Abad faith@ on the part of the State in destroying the evidence
in order to show a violation of due process.[81]  This rule confines the police=s obligation to preserve evidence Ato that class of cases where the interests of
justice most clearly require it, i.e., those cases in which the police
themselves by their conduct indicate that the evidence could form a basis for
exonerating the defendant.@[82]  Turning to
the facts of the case, the Supreme Court explained that the Afailure of the police to refrigerate the clothing
and to perform tests on the semen samples can at worst be described as
negligent.@[83]  Because
there was no suggestion of bad faith on the part of the police, there was no
violation of due process.[84]

The Supreme Court noted two distinctions between the case before it and
Trombetta: AIn the present case, the likelihood that the
preserved materials would have enabled the defendant to exonerate himself
appears to be greater than it was in Trombetta, but here, unlike in Trombetta,
the State did not attempt to make any use of the materials in its own case in
chief.@[85]  In a
footnote to that sentence, the Supreme Court extensively discussed the
requirements of Trombetta and then stated: AThe presence or absence of bad faith by the police
for purposes of the Due Process Clause must necessarily turn on the police=s knowledge of the exculpatory value of the evidence
at the time it was lost or destroyed.@[86]








In Trombetta, the defendant complained about the failure to
preserve breath samples for re-testing by the defense after the samples were
obtained by a breathalyzer machine and produced inculpatory results.[87]  The Supreme Court rejected the defendant=s claim for three reasons.  First, the authorities did not destroy the
breath samples Ain a calculated effort to circumvent the disclosure
requirements established by Brady v. Maryland[88]
and its progeny@ but acted Ain good faith and in accord with the normal
practice.@[89]  The Court
observed that the record contained no allegation Aof
official animus towards the respondents or a conscious effort to suppress
exculpatory evidence.@[90]  Second, the
evidence did not have exculpatory value that was apparent before it was
destroyed.[91]  AAlthough preservation of breath samples might
conceivably have contributed to respondents=
defenses, a dispassionate review of the Intoxilyzer and the California testing
procedures can only lead one to conclude that the chances are extremely low
that preserved samples would have been exculpatory.@[92]  Third, the
evidence was not of Asuch a nature that the defendant would have been
unable to obtain comparable evidence by other reasonably available means.@[93]  There were a
limited number of ways in which the machine could malfunctionCfaulty calibration, extraneous interference with
machine measurements, and operator errorCand the defendants could raise these issues on
cross-examination after examining the machine and the weekly calibration
results.[94]








After Youngblood, the Supreme Court decided Fisher, which
involved a complaint about the destruction of a substance alleged to be
cocaine.[95]  Four tests by a police crime lab confirmed
that the substance was cocaine.[96]  The Court held that the substance Awas plainly the sort of >potentially useful evidence= referred to in Youngblood, not the material
exculpatory evidence addressed in Brady@
because A[a]t most, respondent could hope that, had the
evidence been preserved, a fifth test conducted on the substance would
have exonerated him.@[97]  The
defendant did not show bad faith because Apolice testing indicated that the chemical makeup of
the substance inculpated, not exculpated, respondent@ and Ait is undisputed that police acted in >good faith and in accord with their normal practice.=@[98]  Reversing an
Illinois appellate court, the Supreme Court held that the existence of a
pending discovery request does not eliminate the necessity of showing bad
faith.[99]

                                                  b.
APotentially Useful Evidence@

Applicant=s reliance on Fisher for the proposition that
the term Apotentially useful evidence@ is broad is somewhat misplaced.  None of the Supreme Court=s cases, including Fisher, purport to provide
a stand-alone definition of the term Apotentially useful evidence.@  Rather, the
Court=s cases appear to contrast evidence that is at
best Apotentially useful@ with Amaterial, exculpatory@
evidence under Brady.  When
evidence is at best Apotentially useful,@ then
the defendant must at least show Abad faith.@  That does
not really answer the question of when the potential exculpatory value of
evidence is so attenuated that even a showing of bad faith will not afford a
basis for relief.  








Professors Dix and Dawson suggest that the Apossibility@ of exculpation is not enoughCthat the defendant Amust
apparently show at least a substantial or considerable likelihood the evidence,
if preserved, would have tended to show his innocence.@[100]  A few
isolated cases from other jurisdictions have held that evidence is not even
potentially useful when the potential exculpatory value of the evidence is Amere speculation,@[101] when the allegedly exculpatory fact was legally
irrelevant to the crime charged,[102]
when the allegedly exculpatory fact would not really provide an exculpatory
inference,[103]
when the exculpatory relevance of the evidence was not shown,[104]
when the chance that the evidence would exonerate the defendant was Avirtually nil,@[105] or when other evidence conclusively established
that testing would not yield an exculpatory result.[106]

                                                                  c.
ABad Faith@








More effort has been expended trying to determine the meaning of Abad faith.@  As Dix and
Dawson acknowledge, APrecisely what constitutes >bad faith= is not clear.@[107]  The
suggestion by the habeas court in this case that the test for bad faith is
whether the officials Awere actually aware their action . . . would result
in the loss of . . . evidence@ miscomprehends Professors Dix and Dawson=s thoughtful discussion.  Dix and Dawson state that a defendant Amust apparently prove at least that law enforcement
officials were actually aware their action or inaction would result in the loss
of what they recognized would be evidence.@[108]  They do not
say that such awareness is necessarily enough. 
If awareness that evidence would be destroyed were enough, by itself, to
constitute bad faith, then officials could never conduct a test that would
consume all of the evidence, even if doing so were necessary to achieve
probative results.  Dix and Dawson
suggest that Trombetta articulates at least two situations in which bad
faith would be shown: when the prosecution acts with Aofficial animus@ toward the defendants or acts with Aa conscious effort to suppress exculpatory evidence.@[109]


















A review of federal circuit courts and state courts of last resort in
other jurisdictions reveals  that they
generally require a showing along those two lines.  Some courts have expressly adopted the Trombetta
formulation as the definitive test of bad faith.[110]  Other courts have focused on one or both of
the Trombetta situations, characterizing bad faith as involving improper
motivation or malice,[111]
or defining bad faith as an intent to deprive the defendant of access to
(exculpatory or potentially exculpatory) evidence.[112]  Various jurisdictions have also indicated
that bad faith is not established by a mere showing that the government agent was
grossly negligent,[113]
engaged in intentional conduct,[114]
did not follow proper procedures,[115]
exercised poor judgment,[116]
or performed sloppy work.[117]  Bad faith was held to be absent when
government agents did not suspect that the evidence they destroyed was or might
have been exculpatory,[118]
when destruction of the evidence was due to lack of training[119]
or ignorance of a recently passed law,[120]
when the government agent believed his tactics were lawful,[121]
or when the evidence was destroyed before the government agent was notified
that it might have exculpatory value, before the defendant was a suspect, or
before the defendant expressed a desire to have the evidence preserved.[122]  Knowing the evidence is obviously relevant
to, or even determinative of, guilt or innocence has been held to be
insufficient to show bad faith.[123]  The government=s
ability to preserve the evidence has also been held not to be dispositive.[124]  








But courts have found bad faith where government agents hid or concealed
the evidence until it was destroyed,[125]
destroyed the evidence after being expressly notified by the defense of its
potential exculpatory value,[126]
destroyed the evidence after a dismissal of the case (and then re-instituted
proceedings),[127]
or where government agents refused to show up in court for an inquiry into
their good or bad faith.[128]  The Tenth Circuit has formulated a
five-factor test that considers whether: (1) the government received explicit
notice of the evidence=s potentially exculpatory nature, (2) the claim was
backed up with objective, independent evidence rather than being conclusory,
(3) the evidence was in the government=s control at the time of notice, (4) the evidence
was central to the case, and (5) there is any innocent explanation for the
evidence=s destruction.[129]

Several courts have explained Youngblood=s Abad faith@ requirement as substituting for Brady=s requirement that evidence be exculpatory.[130]  Essentially, an inference that the
evidence  was probably exculpatory can be
drawn from a government agent=s bad faith conduct.[131]









                                                           4.
The Present Case           

                                           a.
Potential Usefulness of the Evidence

The habeas court and the parties have arrived at some erroneous
conclusions because they have treated the DNA evidence as a monolithic whole,
instead of considering each of the four DNA samples separately.  The habeas court made this mistake when it
interpreted Orchid Cellmark=s reference to an Aunknown
individual@ as an indication that the link between applicant
and the DNA evidence was weak.  Although
ReliaGene was able to obtain results from only one of the epithelial samples,
Orchid Cellmark was able to obtain results from both epithelial samples.  For both samples, Orchid Cellmark detected a
primary DNA profile that matched the victim. 
One of the samples also contained some minor alleles matching applicant=s profile. 
The other epithelial sample contained minor alleles that did not match
either the victim or applicant.  These
alleles belonged to another individual (or individuals), whose identity was, of
course, Aunknown.@  Subsequent
testing was done to attempt to rule in or rule out individuals who were
involved in DNA testing as a possible source of contamination.  Notably, Orchid Cellmark was able to rule out
the persons from HPD who were originally involved in collecting and testing the
material: Verbitskey, Hilleman, Childs-Henry, and Chu did not contribute the Aunknown person=s@ DNA.  








Although an unknown person=s DNA was detected in one of the epithelial samples,
that fact does not have any tendency to exculpate applicant.  Because the epithelial samples are composed of
cells that are easily shed, such as skin cells, the DNA in question did not
necessarily come from the perpetratorCit could have come from anyone who had recent
contact with the victim.  It is also
possible that the extraneous alleles are the result of contamination, or the Aallele drop-in@ (referred to by Pineda) that might occur as a
result of repeated testing. Had the sperm samples yielded an Aunknown person=s@ DNA, that fact might have been significant, but
that is not what happened.

The same fallacy of treating the DNA results as a monolithic whole also
underlies the State=s and applicant=s competing positions regarding why the outside labs= test results differ from those obtained by
HPD.  Although the State contends that
the difference in results is due to the quantitative decline of the sample,
applicant questions how that can be, when the outside labs were able to obtain
a complete profile matching the victim. 
The answer to applicant=s question is simple once the samples are treated
separately: The epithelial samples have consistently matched the victim
throughout all of the testing but have never provided strong results with
respect to the perpetrator.   Chu=s STR testing detected a single allele in one of the
epithelial samples that was Aunique@ to applicant=s profile (i.e. not possessed by the victim).  Chu=s testing of the other epithelial sample revealed no
unique alleles. The one unique allele that was detected was one of nine unique
alleles possessed by applicant that was subject to testing.  

The outside labs actually detected a greater number of alleles unique
to applicant=s profile. 
ReliaGene detected two of twelve tested-for unique alleles, while Orchid
Cellmark detected four of fourteen tested-for unique alleles.  Although the habeas record does not contain a
statistical calculation for the random match probability of the single unique
epithelial allele detected by Chu, it seems likely that the four of fourteen
unique alleles detected by Orchid Cellmark yields a stronger link to applicant
than the one of nine unique alleles detected in HPD=s testing. 








Even if that one unique allele detected by Chu somehow carried special
statistical significance that provided a stronger link to applicant than the
four unique alleles detected by Orchid Cellmark (and the two detected by
ReliaGene), that would not make the Orchid Cellmark (or ReliaGene) results
exculpatory.  ReliaGene=s and Orchid Cellmark=s
failure to detect the unique allele detected in Chu=s testing is easily explained, as the State points
out, by the quantitative decline of the sample. 
Although Chu had access to a liquid extract for his testing, ReliaGene
and Orchid Cellmark were forced to use a buffer solution to re-suspend possible
trace amounts of DNA attached to the walls of seemingly empty tubes.    

Because the epithelial DNA was originally derived from cells from the
skin of the victim=s face, one would expect the victim=s cells in the epithelial sample to be, by far, the
most abundant, explaining the outside labs= ability to obtain a full DNA profile matching the
victim, even from the trace amounts of DNA. 
Chu=s ability to detect only one foreign allele suggests
that the epithelial samples contained only a small amount of DNA extraneous to
the victim.  So it is not surprising that
this single foreign allele would be lost after the massive decline in the
quantity of the sample.  Likewise, Orchid
Cellmark=s failure to detect one of the alleles detected by
ReliaGene could have resulted from the further decline in the sample caused by
the second round of tests.








If the testing of the three labs is considered together, a stronger
link to applicant is established.  Each
lab detected at least one unique allele that was not detected by the
others.  Such results could be explained
by the loss of some alleles caused by a quantitative decline in the sample,
combined with the detection of additional alleles through progressively more
sensitive techniques (or perhaps by chance). 
If all of the detected alleles that correspond to the tested loci are
considered without regard to which lab detected them, then there were six
alleles unique to applicant out of fourteen that he possessed that were
subjected to tests.  We do not know if a
statistical calculation could be done that incorporated all three labs= results.   We
simply point out that the discovery of diverse alleles unique to applicant by
the three labs tends to inculpate applicant. So, the further testing of the
epithelial samples seems to have produced a stronger inculpatory inference than
the epithelial samples originally provided.  


 It is nevertheless true that the
epithelial results do not approach the strength of Chu=s results for the sperm samples.  The outside labs were not able to obtain any
results for the sperm samples.  The
failure to obtain results is not exculpatory in itself; it might simply mean
that the samples had degraded to the point where re-testing could not produce
any results.  But with respect to the
strength of the test results, the parties and the habeas court have failed to
appreciate the differences between the sperm samples and the epithelial
samples.  It is true that ReliaGene and
Orchid Cellmark produced results that are much weaker statistically than some
of the results obtained by Chu. 
Applicant sees this difference in the strength of the results as
indicating that the DNA evidence shows the link to applicant to be less
substantial than previously thought, while the State chalks up this difference
to the loss of alleles caused by a quantitative decline in the sample.  Neither position is correct.  The difference in the statistical strength of
the results is a consequence of the fact that different samples are at
issue.  Chu relied upon the sperm samples
at trial, and Bromwich=s statistical calculation of 1 in 232,000 was
undoubtedly based upon the sperm samples. 
The results obtained by the outside labs were for the inferior
epithelial samples.  For the epithelial
samples, it appears that the outside labs obtained stronger results than Chu
obtained, and discovered additional alleles possessed by applicant that were
not previously discovered in the HPD testing. 
Although we do not entirely agree with the State=s reasoning, we agree that the subsequent test
results tend to confirm applicant=s guilt.








In assessing whether the consumed DNA material constituted Apotentially useful@
evidence, we consider the likelihood that a defense expert would have produced
exculpatory results if given the opportunity to test sperm and epithelial
portions of the original liquid DNA extract. 
We conclude that the likelihood of an exculpatory result is small,
though not zero.  Although Bromwich
criticized Childs-Henry=s lack of documentation and would have preferred
that she run more definitive tests for semen, he did not suggest that she
obtained an incorrect result, or that any flaw existed in her analysis that
would have undermined the validity of Chu=s results.  As
we have explained, Bromwich found that Chu had Adeveloped
clean, interpretable profiles@ that were Agood quality and clear results from potentially
difficult forensic evidence samples.@  Bromwich
calculated a 1 in 232,000 random match probability for the African-American
population that was Arelatively strong@ given
the nature of the sample.  We also note
that it is virtually impossible for applicant=s DNA
to have contaminated the original test results because the swab DNA was typed
before applicant was even a suspect.

Nevertheless, in a city the size of Houston, a 1 in 232,000 probability
raises the possibility that a handful of people might perhaps be included in
the DNA results.  A defendant in
applicant=s position would hope that testing by a defense
expert would detect additional alleles inconsistent with the defendant=s DNA profile. 
And given the now-tarnished reputation of the HPD Crime Lab, a defendant
might even hope that a defense expert would obtain dramatically different
results, revealing some unknown malfeasance by the lab.  








The re-testing by ReliaGene and Orchid Cellmark tend to undercut any
such hopes, as the re-testing has produced results consistent with applicant=s DNA.  But,
while contamination of the original HPD test results with applicant=s DNA is a virtual impossibility, it is possible
that contamination could have occurred later, in time to skew the re-testing
results.  Dr. Johnson believed that to be
a possibility, Orchid Cellmark=s Aunknown person@ result for one of the epithelial samples may be an
example of contamination, and the HPD Crime Lab=s act
of forwarding an incorrect reference sample to ReliaGene hardly inspires
confidence.  The possibility of contamination
may also be increased somewhat by the fact that the tubes were seemingly empty,
with relevant Crime Lab personnel believing that the evidence had been
consumed, so the HPD Crime Lab may not have had as much incentive to maintain
the integrity of the evidence.

Given the paucity of authority and the brevity of the pronouncements
regarding whether evidence is even Apotentially useful,@ we
are not certain whether an inquiry into potential usefulness would include
looking at other evidence at trial tending to show that the defendant was
guilty and, therefore, that DNA testing by a defense expert would not likely
yield exculpatory results.  The
background portion of this opinion outlines the substantial, persuasive
evidence of applicant=s guilt aside from the DNA test results, and we will
discuss this evidence in connection with the ineffective assistance of counsel
claim later in this opinion.  This
inculpatory evidence would further support a conclusion that the likelihood of
exculpatory results from defense DNA testing was slim.

Nevertheless, we refrain from deciding whether the consumed DNA
evidence in this case meets a threshold showing of potential usefulness.  That the likelihood of exculpatory results
was slim is a factor that may be taken into account when assessing the
existence or absence of bad faith.  Where
exculpatory results were unlikely, an inference can be drawn that the DNA analyst
was probably not acting with the intent to deprive the defendant of exculpatory
evidence when he destroyed the sample.  A
threshold showing of potential usefulness may be a worthy concept to apply in a
future case; we simply decide here to move on to the question of bad faith.

                                                                  b.
ABad Faith@








The habeas court=s finding of Abad faith@ is based in part upon what we have already
recognized to be an inaccurate definition. 
ABad faith@ is more than simply being aware that one=s action or inaction could result in the loss of
something that is recognized to be evidence. 
As the cases we have discussed show, bad faith entails some sort of
improper motive, such as personal animus against the defendant or a desire to
prevent the defendant from obtaining evidence that might be useful.  Bad faith cannot be established by showing
simply that the analyst destroyed the evidence without thought, or did so
because that was the common practice, or did so because the analyst believed
unreasonably that he was following the proper procedure.

No evidence in this case suggests that Childs-Henry or Chu acted in bad
faith.  Chu specifically stated in his
affidavit that his consumption of the evidence was not the result of a desire
to prevent additional testing.  The
habeas court was not required to believe that affidavit, but to find bad faith,
a finder of fact must do more than simply disbelieve proffered evidence of good
faith: There must be some evidence from which an inference of bad faith can be
drawn.  There is no such evidence
here.  Neither analyst has been shown to
have any animus against applicantCapplicant was not even a suspect at the time testing
was conducted.  Nor is there any evidence
that the analysts were aware of any impropriety in their own conduct, such as a
history of falsifying test results.[132]  The Bromwich Report explained that the
failures in the HPD Crime Lab were the result of a lack of training and of the
isolation of the DNA section of the Crime Lab from the forensic community, not
the actions of Arogue analysts.@








The habeas court gave three reasons for finding bad faith.  First, it concluded that the analysts must
have been aware of a law that was enacted but not yet effective.  But the history of Article 38.39 reveals that
the statute was not enacted until after the HPD Crime Lab=s DNA testing in this case.  The legislation was originally introduced on
January 17, 2001.[133]  The bill passed the Senate on February 19,
2001, and passed the House in an amended version on March 22, 2001.[134]  After the bill was sent to a conference
committee, it passed both houses of the Legislature on April 3, 2001.[135]  The bill was signed by the Governor on April
5, 2001, and made effective immediately.[136]  As we explained earlier, the DNA from the
swab samples was typed on February 20, 2001. We find no basis for the habeas
court=s conclusion that the analysts were aware of this
impending legislation.

Regarding the FBI and NRC recommended standards, we agree that the HPD
Crime Lab=s analysts should have been aware of them.  But given the lack of training and the
isolation of the crime lab from the forensic community, it is questionable
whether the analysts were actually aware of them.  Even if they were, there is no evidence to
suggest that they believed that the standards regarding preservation of a
sample would apply in this case.  

When Childs-Henry discarded the original swabs, there were redundant
samples of DNA.  Although it would have
been better to retain the original swabs, the existence of redundant samples
would appear to satisfy the FBI and NRC guidelines.  








The evidence is clear that, unlike Childs-Henry, Chu understood that
his work would consume all of the remaining sample.  The habeas court cited Chu=s explanation that he had to consume the sample due
to the small amount of DNA, but Chu further testified at trial to conducting a
cross analysis of the swabs, which could not have occurred unless he tested the
material from both swabs, which in turn would require consuming all of the
sample.  As the Bromwich Report explains,
Chu made a mistake in testing samples from both swabs.  He should have saved one of the epithelial
samples and one of the sperm samples for later testing, which could have been
conducted by another DNA lab.  But the
Bromwich Report does not suggest that Chu=s failure to do so was anything other than a
mistake.

 Finally, though we accept that
the habeas court can, from its own recollection, recount common practices
within that court, we cannot accept the habeas court=s conclusion that the HPD Crime Lab analysts must
have been aware of a practice in Harris County regarding any notification that
evidence would be consumed in testing. 
As an example of this practice, the habeas court cited the signed
acknowledgment arising in the instant habeas proceedings regarding Orchid
Cellmark=s anticipated testing.  This document, executed years after the
public disclosure of serious problems with the 
HPD Crime Lab, is not particularly probative of the practice followed
before these problems came to light. 
Further, given the trace amounts of DNA and ReliaGene=s use of a buffer solution, ReliaGene=s testing could have destroyed any remaining
sample.  At the very least, Pineda=s affidavit suggests that ReliaGene=s testing could have been expected to degrade the
sample further, resulting in a further loss of alleles for any subsequent
testing.  Yet, there was no acknowledgment
regarding ReliaGene=s anticipated testing.   








Moreover, we see a practical problem with the idea that analysts should
have notified the prosecutor of the possible consumption of the evidence in
this case.  HPD=s DNA testing was conducted, and the liquid extract
was consumed, before there were any suspects. 
Whatever the practice of the Harris County Criminal District Courts,
there was no defense attorney for the District Attorney=s Office to notify at the time DNA testing was
conducted.  Given the lack of training
received by the HPD Crime Lab=s DNA analysts, nothing in the record suggests that
Childs-Henry and Chu were aware of any need to notify the District Attorney=s Office before consuming the sample, especially
since no prosecution was pending.

                                               B.
Perjury/False Testimony Claim

                      1. The Parties= Arguments and the Habeas Court=s Findings 

Applicant claims that Chu=s statistical frequency estimate constituted Afalse testimony@ and Apossible perjury@ by a
prosecution witness in violation of the Fourteenth Amendment to the United
States Constitution.  To support his
claim, applicant relies upon statements in the Bromwich Report, a letter from
Orchid Cellmark, and statements made by Dr. Johnson in her habeas
affidavit.  From the Bromwich Report,
applicant cites statements that Chu=s statistical frequency estimate was Aincorrect and misleading@ and based upon a practice that was Aextremely flawed.@  Applicant characterizes Orchid Cellmark=s statistical frequency estimate of 1 in 255 for
African-Americans as Athe true statistical frequency for black persons.@  And
applicant cites Dr. Johnson=s statements that Chu=s
trial testimony was Acompletely unsupported scientifically@ and Apatently false,@ as well as her statement that a mixture of DNA Acannot possibly statistically match only one person.@

Finding in the State=s favor on this claim, the habeas court concluded: ABecause the State did not knowingly use false or
perjured testimony at trial, the applicant failed to show that he was denied
Due Process under the Fourteenth Amendment to the United States Constitution.@[137]








Applicant argues in his brief that Alogic
suggests that . . . if the DNA found on the evidence was a mixture of more than
one person=s DNA, then it could not have come from only one
person.@  Applicant
then echoes statements from the Bromwich Report and from Dr. Johnson to the
effect that Chu=s testimony was Acontradictory,
incorrect, misleading, completely inappropriate . . . , internally
contradictory . . . , unsupported scientifically@ and Apatently false.@  Applicant
contends that Chu, an agent of the State, committed perjury and that the
prosecutor unknowingly presented Chu=s false testimony. 
Applicant also argues that the testimony was harmful because DNA is
powerful evidence and Chu=s scientific conclusion was dramatic and cast doubt
on all of the defensive evidence as well. 
Applicant also points to Orchid Cellmark=s 1 in
255 estimate and the Bromwich Report=s 1 in 232,000 estimate as differing from Chu=s claim that no one on Earth but applicant could
have committed the crime. 

The State counters that Chu=s testimony was not perjury because no evidence
shows that Chu had an intent to deceive or knew that his statistical
calculations were false.  Characterizing
Chu=s calculations as Afalse@ or Aarguably false,@ the State contends that applicant is required to
show by a preponderance of the evidence that the testimony contributed to his
conviction or punishment and that he did not do so.  The State discusses a great deal of the
evidence introduced at trial and concludes that Aample
evidence,@ aside from Chu=s testimony, demonstrates applicant=s guilt.

                                                        2.
Preservation of Error








Applicant made no complaint about the alleged falsity of Chu=s testimony at trial.  There is at least a question regarding
whether applicant has forfeited his complaint as a result.[138]  This question is complicated by the fact that
the State has a continuing Aduty to correct >false= testimony whenever it comes to the State=s attention.@[139]  Without
expressing any opinion on the preservation of error question, we will address
the merits.

                                                                    3.
The Law   

How we categorize applicant=s claim is crucial to determining the standard of
materiality or harm to be applied.  

                                (a) Knowing
use of perjured testimony - direct appeal

A prosecutor who procures a conviction through the knowing use of
perjured testimony violates due process: 

[Due process is violated] if
a State has contrived a conviction through the pretense of a trial which in
truth is but used as a means of depriving a defendant of liberty through a
deliberate deception of court and jury by the presentation of testimony known
to be perjured.  Such a contrivance by a
State to procure the conviction and imprisonment of a defendant is as
inconsistent with the rudimentary demands of justice as is the obtaining of a
like result by intimidation.[140]  

 








A
conviction is considered to have been procured through the use of perjured
testimony if the perjured testimony is material.  The standard of materiality for a prosecutor=s knowing use of perjured testimony is the harmless
error standard articulated in Chapman v. California:[141]
the evidence is material (and harmful) unless it can be determined beyond a
reasonable doubt that the testimony made no contribution to the defendant=s conviction or punishment.[142]  This most favorable materiality or harm
standard is available to a defendant on direct appeal.[143]

                                        (b) Knowing
use of perjury - habeas corpus  

On habeas corpus, the standard of harm that must be satisfied to obtain
relief may be more burdensome to the defendant than the standard of materiality
that must be satisfied to establish a due process violation.[144]  In Ex parte Fierro, we determined
that, where the habeas applicant Ahad the opportunity to discover the basis of his
claim in time to advance it at trial or in a motion for new trial,@ he must show Aby a preponderance of the evidence that the error
contributed to his conviction or punishment.@[145]  In other
words, we employed the normal standard on habeas review, with the burden on the
applicant.[146]

Where the habeas applicant lacked such an opportunity, we left open the
possibility that he might Aavail himself of the Chapman harmless error
standard.@[147]  

                            (c) Unknowing use
of perjured testimony - habeas corpus








We have  recently held that due
process may be violated by a prosecutor=s unknowing use of perjured testimony.[148]  In Ex parte Chabot, the applicant had
no prior opportunity to discover the basis for his claim that DNA evidence
proved that the State=s witness had perjured himself.[149]  In discussing what harm standard to employ
under those circumstances, we said, A[W]e see no reason for subjecting the two types of
errors [knowing versus unknowing use of perjured testimony] to different
standards of harm.@[150]  That is, the
preponderance of the evidence standard applies, on habeas review, to either the
knowing or the unknowing use of perjured testimony.

Chabot did not settle the
question left open in Fierro regarding whether a more favorable standard
of harm may apply to the knowing use of perjured testimony that the habeas
applicant had no prior opportunity to discover. 
Rather, Chabot does not appear to have taken into account the
caveat in Fierro, and so Chabot simply stands for the proposition
that the preponderance of the evidence standard is appropriate for the
unknowing use of perjured testimony that the habeas applicant had no prior
opportunity to discover.[151]  It remains unsettled whether a more favorable
standard might be available to a defendant in the Aknowing use@ context.

                               (d) False
testimony as opposed to perjured testimony








In Estrada v. State, we held on direct appeal that false
testimony that was not perjury resulted in a due process violation when there
was Aa fair probability that [the] death sentence was
based upon . . . incorrect testimony.@[152]  In that
case, the State=s witness gave inaccurate testimony about the prison
classification system but was not aware of the inaccuracy.[153]  The jury sent out a note regarding the very
subject matter of this testimony.[154]  It was later determined that the testimony
was inaccurate, and the State confessed error on direct appeal.[155]  In sustaining the defendant=s contention, we held that his complaint was not
forfeited because the defendant Acould not reasonably be expected to have known that
the testimony was false at the time that it was made.@[156]

                                 (e) False
testimony in the actual innocence context

Finally, we observe that our Aactual innocence@
jurisprudence could encompass a claim on habeas that involved newly discovered
evidence that a witness=s testimony was false.[157]  Under that jurisprudence, the habeas
applicant must show Aby clear and convincing evidence that, presented
with both the inculpatory evidence at trial and the newly discovered or
available evidence of innocence, no reasonable juror would have convicted him.@[158]

                                                           4.
The Present Case








To obtain the most favorable standard of materiality or harm that might
possibly apply, applicant must show that the State knowingly used perjured
testimony and that he did not have an opportunity to discover the perjury in
time to present a claim at trial or in a motion for new trial (or perhaps on
appeal).  No one has contended in this
case that the prosecutors were aware that there was any problem with Chu=s statistical frequency estimate.[159]  Nevertheless, we treat perjured testimony as
knowingly used if the witness was a member of the Aprosecution team.@[160]  To obtain
review under the most favorable standard of materiality or harm, then,
applicant must at least show: (1) that Chu was a member of the prosecution
team, (2) that Chu committed perjury, and (3) that applicant did not have an
opportunity to discover the perjury in time to present his claim at an earlier
proceeding.

In Texas, the crime of perjury is committed if Awith intent to deceive and with knowledge of the
statement=s meaning@ a person makes a false statement under oath or
unsworn declaration.[161]








In
connection with a claim regarding the knowing use of perjured testimony, the
First Circuit relied upon federal law defining perjury as Athe willful intent to provide false testimony,
rather than as a result of confusion, mistake, or faulty memory.@[162]  The Fifth
Circuit, however, has eschewed Athe strict legal definition of perjury@ and found Aperjury@ within the meaning of the prohibition against its
knowing use when witnesses Adid not candidly respond to the defense counsel=s questions.@[163]        But
regardless of the precise contours of the meaning of Aperjury@ for the purpose of determining a due process
violation, applicant has not demonstrated that Chu committed perjury in this
case.  The habeas court found against
applicant on this claim, so we review the evidence deferentially in the State=s favor. 
Nothing in the record before us suggests that Chu intended to provide
false testimony or to deceive, or that he was less than candid in his
testimony.  In other words, we have no
reason to believe that Chu thought his testimony was inaccurate.  The Bromwich Report indicates that Chu=s method of calculating the statistical frequency
estimate, though extremely flawed, was the HPD Crime Lab=s usual practice. 
The Bromwich Report did not suggest that HPD analysts were committing
perjury every time they testified to their usual calculations in court.  As we have pointed out, the report said that
the problems with the HPD Crime Lab were due to poor training and not to rogue
analysts.  There is ample support for a
finding that Chu did not commit perjury, consistent with the habeas court=s conclusion that the State did not knowingly use
perjured testimony.  Because Chu did not
commit perjury, applicant=s claim does not fall within Fierro=s caveat regarding knowing-use-of-perjury claims
that could not have been presented previously. 
We again leave open that question.[164]  








For habeas corpus proceedings involving the unknowing use of perjured
testimony, the harm standard would be preponderance of the evidence, as we have
stated above.  Applicant would not be
entitled to a more favorable standard for the unknowing use of false (but not
perjured) testimony.  The preponderance
of the evidence standard is less favorable to applicant than the standard
employed in analyzing an ineffective assistance of counsel claim under Strickland
v. Washington.[165]  As explained below, applicant fails to meet
the prejudice prong of Strickland. 
This means that applicant=s false evidence claim must also necessarily
fail.   

                                            C.
Ineffective Assistance of Counsel

                      1. The Parties= Arguments and the Habeas Court=s findings

In his application, applicant contends that defense counsel Greenlee
performed deficiently in failing to hire a forensic or DNA expert.  Applicant further claims that, had defense
counsel hired an expert: (1) Chu=s statistical analysis would have been revealed at
trial as false, (2) the jury would have been made aware that Chu violated the
standard of care in his profession when he consumed all of the DNA evidence,
and (3) defense counsel would have been able to obtain the same type of testing
that was later conducted by ReliaGene and Orchid Cellmark.  Applicant also contends that Greenlee performed
deficiently by failing to object to the DNA test results on the basis of Chu=s consumption of the sample, by failing to move for
a continuance after Childs-Henry testified that there was liquid extract sample
remaining so that DNA testing could then occur, and by failing to adequately
cross-examine Childs-Henry and Chu at trial. 

In his brief, applicant also points to Greenlee=s lack of prior experience in DNA matters and
suggests that he could not possibly conduct a proper investigation without the
help of an expert.  He also argues that
there was no good reason for Greenlee to forgo an expert witness who could have
enhanced the defense trial strategy of emphasizing the unfairness of the lab=s consumption of all of the DNA evidence.  Applicant also contends that there were many
areas of possible impeachment of the State=s experts that were not raised at trial. Applicant
also describes as Ainexplicable@ Greenlee=s failure to move for a continuance when
Childs-Henry indicated that DNA extract still existed.








Regarding the prejudice prong of Strickland, applicant contends
that, had counsel performed properly, the following information would have been
learned and used at trial: (1) that Chu=s statistical frequency estimate was illogical and
false, (2) that the HPD Crime Lab=s consumption of the entire sample was unnecessary
and improper, (3) that the quality of Childs-Henry=s testing for semen was poor, and (4) that obtaining
DNA profiles from a mixture was fraught with difficulty.  Applicant contends that this information
would have changed Athe entire complexion of the case.@

The State counters that Greenlee made strategic decisions with
plausible bases after a thorough investigation. 
The State points to various acts by defense counsel and his articulated
strategies.  This discussion by the State
essentially rehashes the habeas court=s findings.








The court found that Greenlee=s testimony at the evidentiary hearing was
credible.  The court found that Greenlee
had a good working relationship with the prosecutors, who provided him with
whatever information he requested, and had free access to the State=s files and evidence.  It also found that Greenlee had no reason to
doubt Glaeser=s representation that the DNA evidence had been
consumed, with nothing left for an independent analysis.  The court found that Greenlee=s decision to proceed without an expert was based on
a strategy of arguing to the jury the unfairness of being denied an opportunity
to conduct independent testing.  The
court found that this strategy was formulated after a thorough investigation
that included consulting at least one other defense attorney.              The
court also pointed to Greenlee=s strategy of cross-examining the crime scene
officer, Verbitskey, to show that he was not qualified to collect the swabs
from the victim=s cheek and may have exposed the evidence to
contamination.  The court found that
defense counsel=s cross-examination of Childs-Henry was
strategically designed to show that she was results-oriented, could not
describe the protocol and procedures she followed in performing the DNA
extraction, and could not confirm that she followed the proper steps in the
proper order during the procedure.  The
court also found that Greenlee=s cross-examination of Childs-Henry elicited what
Greenlee perceived to be the beneficial testimony that only a Asloppy chemist@ would consume all of the evidence in performing a
DNA analysis.  And the court found that
defense counsel cross-examined Chu with a strategy toward Ademonstrating that Chu had consumed all of the DNA
evidence without regard for the fact that the defense was denied an opportunity
to conduct independent DNA testing.@  The court
further found that Greenlee believed that his cross-examination succeeded in
this purpose and that he did not need a consulting expert to accomplish that
end.

The court also found that defense counsel emphasized in closing
argument that the defense was unfairly denied the opportunity to conduct
independent DNA testing and that the jury should not accept the DNA results
solely on the word of the State=s witnesses.

The court further found that defense counsel did not move to suppress
the DNA test results because he did not believe he had a valid legal basis for
doing so.  The court also found that
Greenlee was surprised by Childs-Henry=s testimony that there was DNA sample remaining,
that Greenlee explored this issue with the prosecutor and the State=s witnesses, and that Greenlee determined that there
was in fact no DNA sample left to test. 
And the court found that the problems with the HPD Crime Lab did not
become public knowledge until November 2002. 
The court further found that, against counsel=s advice, applicant made an intelligent, knowing,
and voluntary decision to testify.  The
court found that Greenlee believed that the negative consequences of applicant=s decision to testify outweighed the negative impact
of the DNA evidence.          








Based upon its own independent recollection of the trial, the court
found that Greenlee=s cross-examination of HPD Crime Lab personnel was Aeffective trial strategy in that it was aggressive,
probing, confrontational and effective@ regarding an attack on the HPD Crime Lab protocol.  The court also found that Greenlee=s decisionsCnot to retain a consulting expert, not to pursue
independent DNA testing, and not to seek a continuanceCAwere all made after a thorough investigation and
were reasonable trial strategy.@  The court
echoed this particular finding in its conclusions of law, and the court also
concluded that applicant failed to show that the trial court would have
committed error in denying a motion to suppress the HPD Crime Lab=s DNA test results. 

                                                       2.
Deficient Performance

Strickland prescribes a
two-part test for determining whether a defendant has been constitutionally
deprived of effective assistance of counsel: (1) deficient performance, and (2)
prejudice.[166]  Deficient performance means that Acounsel made errors so serious that counsel was not
functioning as the >counsel= guaranteed the defendant by the Sixth Amendment.@[167]  To establish
deficient performance, Athe defendant must show that counsel=s representation fell below an objective standard of
reasonableness.@[168]  When trial
counsel does not conduct a complete investigation, his conduct is Areasonable only to the extent that reasonable
professional judgments support the limitations on investigation.@[169] 








Despite the habeas court=s findings, the record raises serous issues with
respect to Greenlee=s performance. 
One reason Greenlee gave for declining to hire an expert was that the
expert might validate the procedures followed by the HPD Crime Lab in this
case.  But defense counsel could have
initially hired an expert for consulting-only purposes, to be designated later
as a testifying expert if the expert=s opinions turned out to be favorable.  In Williams v. State, a case decided
years before applicant=s trial, we recognized that an indigent defendant
was entitled to make his request for funds to hire an expert witness in an ex
parte hearing.[170]  The rationale underlying our holding was the
need to protect the confidentiality of the defendant=s work product.[171]  In Skinner v. State, decided the same
year as Williams, we explained that an expert=s Acomments about the strengths and weaknesses of the
defense theory@ were covered by the work product doctrine.[172]  Williams also quoted a Fifth Circuit
discussion that emphasized the need to treat monied and indigent defendants
equally: 

The government should not be
able to obtain a list of adverse witnesses in the case of a defendant unable to
pay their fees when it is not able to do so in the cases of defendants able to
pay witness fees. When an indigent defendant=s case
is subjected to pre‑trial scrutiny by the prosecutor, while the monied
defendant is able to proceed without such scrutiny, serious equal protection
questions are raised . . . .[173]

 

A defendant
with the resources to hire his own expert could hire someone on a
consulting-only basis without the State ever discovering that he had done so.[174]  Under Williams and Skinner, an
indigent defendant has the same capability.








In choosing to forgo an expert, defense counsel elevated the importance
of his own personal investigation of DNA science.  We will not discount the possibility that an
attorney with no prior knowledge of DNA matters may become sufficiently
knowledgeable through his own diligent sifting of the scientific literature,
without the aid of an expert.  But it is
apparent in this case that Greenlee was not able to acquire sufficient
knowledge on his own.  Had he done so, he
would have known that the HPD Crime Lab failed to adhere to accepted practices
when it consumed all of the DNA evidence, and he would have understood that Chu=s statistical frequency estimate was probably
incorrect.  Even without an expert of his
own, Greenlee could have at least cross-examined Chu with relevant scientific
literatureCsuch as the FBI and NRC standardsCregarding the desirability of retaining a portion of
the DNA evidence for additional testing.[175]  Defense counsel could have pointed out,
through questioning and argument, that two of the tubes of DNA material were
redundant and did not have to be tested. 
That Greenlee did none of these things shows that he was probably
ill-equipped to research the field without expert assistance.  

Even so, defense counsel should have conducted an investigation that
was diligent enough to reveal that he needed the help of an expert in preparing
for trial and cross-examining witnesses. 
In 2001, a variety of investigative tools existed that would have
enabled Greenlee to determine that he needed an expert witness, including: an
informal pre-hiring consultation with an expert, consultation with knowledgeable
defense attorneys, continuing legal education, use of a medical library, and
use of the internet.   Although Greenlee
consulted other attorneys, we cannot conclude that doing so was sufficient
investigation in this case given the fact that Greenlee still lacked much  understanding of DNA science.           








And expert testimony would probably have given a boost to the defense
beyond what could have been accomplished through cross-examination.  A live expert could have explained that the
FBI and NRC guidelines were not followed when Chu consumed virtually the entire
sample in this case, and an expert could have testified to the flaws in Chu=s statistical frequency calculation and given a more
accurate calculation of the random match probability.  A defense expert=s testimony on these subjects would have been likely
to carry more weight with a jury than cross-examination alone.
Cross-examination may render unnecessary the presentation of one=s own expert, especially if the cross-examination
aggressively exploits learned treatises,[176]
but that did not happen in this case.

Greenlee did bring up the unfairness of consuming the DNA evidence, but
Chu=s rejoinder was that the sample size was so small
that it had to be used up.  The defense=s cross-examination of Chu gave the jury no reason
to think that Chu=s effective consumption of the entire sample was
anything other than an unfortunate but unavoidable circumstance.

The only evidence that potentially attacked Chu=s explanation was the testimony elicited from
Childs-Henry that the entire sample could be consumed if the chemist was
sloppy.  But Childs-Henry also said that
the entire sample could be consumed if it was too small, which was consistent
with Chu=s explanation. 
And while Childs-Henry indicated that the sample was large enough to
have some left for re-testing, the credibility of that assessment was
undermined by her error in believing that some sample still remained.  Defense counsel did a creditable job of
impeaching Childs-Henry with her inability to explain her own procedures; her
mistake regarding the existence of any remaining sample, though a surprise,
impeached her credibility as well.  








 However, we reject applicant=s contention that Greenlee was deficient in failing
to move for a continuance after Childs-Henry=s
testimony that DNA material remained to be tested.  The evidence at trial (as well as the habeas
proceedings) was that Childs-Henry was simply mistaken in her belief that there
was liquid extract remaining.   We do not
think her testimony at trial fairly raised the notion that there might be trace
amounts of DNA adhering to seemingly empty tubes.  To the extent that her testimony suggested
that there should have been DNA material remaining, that conclusion was one
that Greenlee should have drawn prior to trial, and we have already concluded
that Greenlee was deficient in that regard.

                                                                   3.
Prejudice  

Having found deficient performance, we turn to the question of
prejudice.  The prejudice prong of Strickland
requires showing Aa reasonable probability that, but for counsel=s unprofessional errors, the result of the
proceeding would have been different.@[177]  AA reasonable probability is a probability sufficient
to undermine confidence in the outcome.@[178]  It is not
enough that counsel=s errors could have had Asome conceivable effect on the outcome of the
proceeding,@ but a defendant does not have to show that counsel=s deficient conduct Amore
likely than not altered the outcome of the case.@[179]  This usual
standard for showing prejudice is not always sufficient, however.  If the proceeding was Arendered neither unreliable nor fundamentally unfair@ by counsel=s deficient performance, then the prejudice question
can be answered in the negative to prevent the defendant from obtaining a Awindfall.@[180] 








As we explained in connection with his Youngblood claim,
applicant would not have been entitled to the suppression of the DNA test
results.  Had counsel conducted a proper
investigation, an attack might have been made on the quality of Childs-Henry=s testing, but there is no indication that such an
attack would do anything to undermine the validity of Chu=s results, which were based upon his own
testing.  Defense counsel would have been
able to introduce evidence that consuming the entire sample was bad laboratory
practice, but there is no indication that the test results themselves flowed
from any flawed practices.  To the
contrary, Bromwich characterized Chu=s work as generating Agood
quality and clear results@ and developing Aclean,
interpretable profiles.@  And a jury
would still be confronted with the fact that the genetic typing occurred before
applicant even became a suspectCeliminating the possibility of contamination from
applicant=s own DNA.  

Had defense counsel conducted a proper investigation, he would have
been able to introduce evidence that Chu=s statistical frequency estimate was flawed, and he
would have been able to introduce a correct estimate in line with Bromwich=s calculations: e.g. a random match probability for
the African-American population of 1 in 232,000.  A probability of 1 in 232,000 is still quite
low, although, with a city the size of Houston, it might allow for the possibility
of a handful of other people matching the test results.








But when a 1 in 232,000 random match probability is combined with the
other evidence introduced at applicant=s trial, there is no reasonable probability of a
change in outcome.  The victim picked
both applicant and his car out of separate lineups.  Although the victim could not or did not
identify applicant via closed-circuit television at trial, the victim indicated
that he was positive when he picked applicant out of a pretrial lineup, and the
circumstances surrounding that pretrial identification (the victim=s smile when the camera panned on applicant) further
reinforces the identification.  A composite
sketch drawn from the victim=s descriptions was consistent with applicant=s appearance. 
The exterior and interior of applicant=s
house, along with his yard, were consistent with the descriptions given by the
victim to law enforcement.  Purple
clothing found in applicant=s house and car were also consistent with the victim=s prior descriptions, as was a dark baseball cap
recovered from applicant=s car.  The
color of the interior of applicant=s car was consistent with the victim=s description, and the exterior of the car was
damaged in a way that was consistent with the victim=s brother=s description. 
And the bottle of orange cocoa butter lotion found in applicant=s house matched the victim=s description of Aorange
grease@ used by the perpetrator. 

At trial, E.T. identified from photographs various items that looked
like items he encountered when he was kidnapped: the outside of applicant=s house, the brown couch, the purple clothes, and a
Houston Oilers cannister.  E.T. pointed
to circles on applicant=s sidewalk that he recognized.

Applicant=s defensive evidence was not helpful.  His alibi was full of holes.  Although electronic monitoring established
that applicant arrived home at 3:07 p.m., that arrival time did not exclude him
as the perpetrator.  The family members
who attempted to establish an alibi gave testimony that was inconsistent with
each other and with their own prior statements, resulting in estimates for
applicant leaving the Savage residence ranging from 1:30 to 3:30 p.m.  The prosecution effectively exploited David
Savage=s testimony that he saw applicant on television on
February 12th, at which time applicant was not a suspect, but the
composite drawing was being shown. 
Finally, applicant himself stated that the victim was taken to an
apartment Abefore he come to my house.@  It is not
apparent how this could be taken as anything other than an inadvertent
admission that the child was at applicant=s house. 








The jury also heard applicant=s refusal to acknowledge responsibility for any of
the offenses he had already been convicted of. 
And applicant=s testimony, some of which was evasive, showed his
disregard for the geographical-limitation conditions of his parole and his
numerous violations of those conditions.

Applicant=s testimony also suggested his own consciousness of
guilt, as he advanced implausible explanations in an attempt to distance
himself from evidence that tended to link him to the crime:  He denied owning the cocoa butter lotionCsaying that he must have taken it from his brother=s room and that it was owned by his brother=s sister.  And
applicant denied that his car was damaged on February 11th, claiming
that the police must have caused the damage while the car was in their
custody.  And he accused parole officer
Butler of lying about the conditions of his parole.  All of the evidence shows a very strong case
against applicant, even when Bromwich=s criticisms of the HPD Crime Lab=s conduct are taken into account.[181]









Finally, we conclude that the new test results from ReliaGene and
Orchid Cellmark do not alter the prejudice analysis in applicant=s favor.  It
is not a foregone conclusion that an Aeffective@ attorney would have sought further testing upon
discovering the errors committed by the HPD Crime Lab in this case.[182]  Even so, we have already explained, in
connection with the Youngblood discussion, that the test results from
ReliaGene and Orchid Cellmark were not exculpatory, but rather tended to
incriminate applicant.

                                                              III.
CONCLUSION

For the reasons outlined above, we reject applicant=s Youngblood, perjury/false statement, and
ineffective assistance of counsel claims.[183]  We deny relief.

Delivered: September 29,
2010

Publish

  











[1]  On
cross-examination, a police officer testified that applicant=s skin was lighter than the complainant=s skin as depicted in photographs, but the officer
noted that photographs Avery often change the tone of a black person.@





[2]  All of the
sample was consumed except for microscopic residue adhering to the walls of the
tubes.





[3]  According to
the habeas court=s finding number two, the house was approximately
eleven miles away from the site of the kidnapping.





[4]  The house
contained another bedroom that was being used to store property belonging to
applicant=s brother.





[5]  The table is
taken from Michael R. Bromwich, Final
Report of the Independent Investigator for the Houston Police Department Crime
Laboratory and Property Room, Report at 190 (June 13, 2007)
(allelic table of STR Results Obtained by Mr. Chu) and is contained in the
habeas record.  The loci D3S1358,
D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820 have been abbreviated to D3,
D8, D21, D18, D5, D13, and D7 respectively. 
In the table, AEF@ stands for Aepithelial fraction@ and
SF stands for Asperm fraction,@ and explanatory references to that effect in the
table have been omitted.  

The parties
and the habeas court rely upon portions of the Bromwich Report in the instant
habeas proceedings, and in finding 55, the habeas court cites to the report and
to its website address.  As will be
discussed below, the Bromwich Report made a number of general observations
about the DNA/Serology section of the Crime Lab.  The portions of the report containing these
observations are not included in the habeas record, though they are available
at the website listed in finding 55, and the habeas court may have made
reference to these portions when it referred in finding 41 to certain general
practices of the HPD Crime Lab that were Asubjects that the Bromwich Investigation would also
underscore in its report five years later.@  We have in
the past held that an appellate court may consider evidence that was not
formally admitted if it is treated as admitted by the trial court.  Kissinger v. State, 501 S.W.2d 78, 79
(Tex. Crim. App. 1973); Richardson v. State, 475 S.W.2d 932, 933 (Tex.
Crim. App. 1972); see also Texas Health Enters. v. Texas Dep't. of Human
Servs., 949 S.W.2d 313 (Tex. 1997). 
Given the reliance by the parties and the habeas court and the ready
availability of the entire report at the website recited in the habeas court=s findings, we rely upon the  Bromwich Report in its entirety.





[6]  Id.
at 190 (text and allelic table).





[7]  Id.
(allelic table).





[8]  Id.





[9]  Id.





[10]  Id.





[11]  Id.  The AD21@ locus in the allelic table appears to contain some
information contrary to Bromwich=s characterizations. 
It displays the alleles A18, 32.2@ on one row and A29@ on the next row. 
Id.  Although Bromwich
stated that all alleles foreign to the victim are consistent with applicant=s DNA profile, id. at 190, no A18@ is contained in the victim=s or applicant=s profile at this locus.  Id. (allelic table).  The victim=s
profile contains a A28@ at this locus and the other three samples include a
A28@ in the results, id., so the A18@ may have been a typographical error.  Also, the report purports to indicate in
boldface type all of the alleles matching applicant that were foreign to the
victim, id. at 190, but A32.2@ does not appear in boldface, id. (allelic
table), though it matches applicant=s profile and is foreign to the victim=s profile. 
If, as seems probable, the A18@ should be a A28,@ it is also probable that the A32.2@ should be a A31.2@Can allele possessed by the victimCwhich would follow what appears to be Bromwich=s convention of placing alleles belonging to the
same individual on the same row if those alleles are unique to that
individual.  The body of this opinion
assumes these were indeed typographical errors. 
If that assumption is incorrect, then the results match applicant=s profile in its entirety and contain a single
allele foreign to both the victim and applicant. 





[12]  Id.





[13]  Id.
at 190.





[14]  Chu
acknowledged that he could not say with 100 percent certainty that a mistake
would show up.





[15]   Specifically,
the prosecutor recounted Savage=s testimony as follows: AWell, I remember when I went to work the next day
all the police were there and they were talking about it, and the TV was on and
I saw my cousin.  Folks, that=s February 12. 
Lawrence Napper=s name was never mentioned until February 23,
2001.  Why did he see his cousin on
TV?  The composite.  He recognized his cousin on TV on February
12, 2001.@





[16]  When asked
to explain his relationship to his Abrother=s sister,@ applicant testified, AMe and
Ronnie have the same mother and the same father, but me and his sister and
other brother, they don=t have the same, they just have the same daddies.@  Applicant
also testified that his Abrother=s sister@ was not related to him in any way.  





[17]  Defense
counsel objected to this testimony from applicant as nonresponsive, and that
objection was sustained.  Several other
times, the trial judge sustained defense objections to applicant=s nonresponsive testimony. 





[18]  See Tex. Penal Code ' 12.42(c)(2).





[19]  See Tex. Civ. Prac. & Rem. Code ' 132.001, et seq.





[20]  Napper v.
State, Nos. 11-02-00017-CR & 11-02-00018-CR (Tex. App.BEastland December 19, 2002, pet. ref=d) (not designated for publication).





[21]  Id.,
slip op at 4.





[22]  Id.
at 4-5.





[23]  Id.
at 6.





[24]  Id.
at 8.





[25]  Id.





[26]  Bromwich, Report
at 4.





[27]  Id.





[28]  Id.





[29]  Id.





[30]  Id.





[31]  The article
is in the habeas record.





[32]  Bromwich, Executive
Summary at 4.





[33]  Id., Report
at 26.





[34]  Id., Executive
Summary at 10.





[35]  Id.
at 8.





[36]  Id.
at 7.





[37]  Id.
at 10.





[38]  Id., Executive
Summary at 10, Report at 32.





[39]  Id., Report
at 50-51.





[40]  Id.
at 32.





[41]  Id.
at 122.  And when DNA analysts did
recognize problems and voice concerns to their superiors, those concerns were
often ignored.  Id. at 41.  For example, Chu recognized a problem with
evidence being shuffled between Atoo many chemists,@ but
this concern was dismissed by one of his superiors.  Id. 
His concern proved to be prescient in the Lynn Jones case, two years
later.  Id.





[42]  Id., Executive
Summary at 10.





[43]  Id.





[44]  Id., Report
at 189.





[45]  Id., Executive
Summary at 13.





[46]  Id., Report
at 190.





[47]  Id., Executive
Summary at 13.





[48]  Id., Report
at 192.





[49]  Id.
at 195.





[50]  Id.
at 194-95.





[51]  Id.
at 192.





[52]  Id.





[53]  Id.
at 194.





[54]  Id.
at 191.





[55]  Id.





[56]  Id.





[57]  Id.





[58]  Id.





[59]  Id.
at 140.





[60]  Id.





[61]  Id.





[62]  Id.





[63]  Id.
at 141.





[64]  Id.
at 190.





[65]  Id.
at 191.





[66]  Id.





[67]  FBI, DNA
Advisory Board, Quality Assurance
Standards for Forensic DNA Testing Laboratories, Standard 7.2 (1998).





[68]  National
Research Council, NRC II Recommendations, Recommendation 3.3.





[69]  Id.
(introductory comment to Recommendation 3.3).





[70]  Ex parte
Chabot, 300 S.W.3d 768, 772 (Tex. Crim. App. 2009).  





[71]  488 U.S. 51
(1988).





[72]  540 U.S. 544
(2004).





[73]  See George
E. Dix and Robert O. Dawson, 42 Texas
Practice, 2nd ed., '22.63 (2001).





[74]  The document
in that appendix appears to be a draft that was signed by the prosecutor but
not by defense counsel or the court. It is dated A2004,@ it does not specify most of the items that were
tested, and it does not specify who would conduct the testing.  As discussed above, in 2005, the parties
signed an authorization for Orchid Cellmark to conduct testing.





[75]  See 540
U.S. at 548 (referring to substance as Apotentially useful evidence@ where the claim was that Aa fifth test@ might
produce exculpatory results) (emphasis in original).





[76]  Ex parte
Pena, 71 S.W.3d 336, 337-38 (Tex. Crim. App. 2002).





[77]  448 U.S. at
52.





[78]  Id.
at 57.





[79]  467 U.S. 479
(1984).





[80]  Youngblood,
488 U.S. at 57-58 (quoting Trombetta, 467 U.S. at 486).





[81]  Id.
at 58.





[82]  Id.





[83]  Id. 





[84]  Id.





[85]  Id.
at 56.





[86]  Id.
at 56 n.*.





[87]  See 467
U.S. at 487-90.





[88]  373 U.S. 83
(1963).





[89]  Trombetta,
467 U.S. at 488.





[90]  Id.





[91]  Id.
at 489.





[92]  Id.





[93]  Id.





[94]  Id.
at 490.





[95]  Fisher,
540 U.S. at 545.





[96]  Id.





[97]  Id.
at 548 (emphasis in original).





[98]  Id.





[99]  Id.





[100]  Dix and
Dawson, '22.64.





[101]  United
States v. Jobson, 102 F.3d 214, 219 (6th Cir. 1996) (no evidence
that destroyed dispatch tape had contained any exculpatory information); Grady
v. State, 2008 WY 144, P33, 197 P.3d 722, 732-33 (2008).





[102]  United
States v. Williams, 577 F.3d 878, 882-83 (8th Cir. 2009)
(firearm did not have to be operational to support conviction under firearm
charge, so evidence that firearm may not have been operational was not
potentially exculpatory). 





[103]  United
States v. Smith, 534 F.3d 1211, 1224 (10th Cir. 2008) (serial
numbers would not have proven defendant=s innocence but shown only Athat perhaps she handled her money differently than
a typical drug dealer@); Torres v. Mullin, 317 F.3d 1145, 1161 (10th
Cir. 2003) (proving fingerprint did not belong to defendant had no exculpatory
value because fingerprint could have been made by a number of people who lived
in or visited the home).





[104]  Williams
v. United States, 881 A.2d 557, 565 (D.C. App. 2005) (defendant did not
demonstrate how revolver owned by drug rival would have been exculpatory).





[105]  Wenzel v.
State, 306 Ark. 527, 533, 815 S.W.2d 938, 941 (1991) (DNA testing by the
FBI of vaginal swabs containing semen).





[106]  State v.
Dulaney, 493 N.W.2d 787, 791 (Iowa 1992) (plasma sample show alcohol
concentration consistent with blood sample, so no valid claim that further
testing of blood sample could yield exculpatory results).





[107]  Dix and
Dawson, '22.63.





[108]  Id.





[109]  Id.





[110]  Jobson,
102 F.3d at 218; United States v. Chaparro-Alcantara, 226 F.3d 616, 624
(7th Cir. 2000); Stuart v. State, 127 Idaho 806, 816, 907
P.2d 783, 793 (1995); State v. Lindsey, 543 So. 2d 886, 891 (La. 1989).





[111]  United
States v. Garza, 435 F.3d 73, 75 (1st Cir. 2006) (Defendant must
show Aindependent evidence that the [government] was
somehow improperly motivated.@); United States v. Thompson, 130 F.3d 676,
686 n.17 (5th Cir. 1997) (no demonstration of malice in tape=s destruction); Gausvik v. Perez, 345 F.3d
813, 818 (9th Cir. 2003) (The defendant must Aput forward specific, nonconclusory factual
allegations that establish improper motive.@); Collins
v. Commonwealth, 951 S.W.2d 569, 573 (Ky. 1997) (Defendant Acannot substantiate any ill motive or intention on
the part of the Commonwealth in failing to collect the towel.@); Murray v. State, 849 So. 2d 1281, 1286
(Miss. 2003) (quoting Black=s Law Dictionary: Abad
faith@ means the Aconscious doing of a wrong because of dishonest
purpose or moral obliquity; it is different from the negative idea of
negligence in that it contemplates a state of mind affirmatively operating with
furtive design or ill will@).





[112]  Featherstone
v. Estelle, 948 F.2d 1497, 1505 (9th Cir. 1991) (finding that
destruction of lineup photo was not in bad faith because Ait was not deliberately done to deprive petitioner
of access to relevant evidence@); People v. Seaton, 26 Cal. 4th
598, 656-57, 28 P.3d 175, 209 (2001) (no showing that police believed the
unpreserved blood evidence would have exculpated defendant or Athat their purpose was to deny him the opportunity to
use the evidence to exculpate himself@); United States v. Day, 697 A.2d 31, 35-36
(D.C. App. 1997) (ANothing in the record on appeal hints, even
remotely, that the police destroyed the car so that [defendant] could not
examine it, or have it viewed by an expert.@); Dufour
v. State, 905 So. 2d 42, 68 (Fla. 2005) (quoting Guzman v. State,
868 So.2d 498, 509 (Fla. 2003): AUnder Youngblood, bad faith exists only when
police intentionally destroy evidence they believe would exonerate a defendant.@); Guzman, 868 So. 2d at 510 (no showing that
Aany State actor intentionally deprived [defendant]
of evidence which the State actor believed to be exculpatory@); Dulaney, 493 N.W.2d at 791 (no evidence
State Aintentionally destroyed@ blood sample Ain an effort to deprive [defendant] of evidence@); State v. Berkley, 567 A.2d 915, 918 n.3
(Me. 1989) (collusion designed to prevent independent testing would establish
bad faith); State v. Bailey, 677 N.W.2d 380, 393 (Minn. 2004) (Ano suggestion that the State destroyed or released
items >to avoid discovery of evidence beneficial to the
defense=@); Murray, 849 So. 2d at 1286 (bad faith
where Adestruction was intentional and indicates fraud and
a desire to suppress the truth@); State v. Hernandez, 2005 ND 214, P31, 707
N.W.2d 449, 461 (2005) (defining Abad faith@ to mean Athe evidence was deliberately destroyed by or at the
direction of a State agent who intended to thwart and to deprive the defense of
information.@); State v. Bousum, 2003 SD 58, P16, 663
N.W.2d 257, 263 (2003) (adopting North Dakota=s
definition of Abad faith@); Drury v. State, 2008 WY 130, P19, 194 P.3d
1017, 1023 (2008) (In determining bad faith, Awe
must take into account the State=s knowledge of the potential exculpatory nature of
the evidence.@).

The Supreme
Court of North Dakota has indicated that, although not constituting Abad faith,@ if there were shown to be a Asystemic disregard@ of
the AState=s duty to zealously protect evidence in its
possession@ so that Ahaphazard handling and destruction of evidence . . .
is commonplace,@ then Aprophylactic measures, such as an adverse-inference
instruction@ may be justified. 
City of Bismarck v. Holden, 522 N.W.2d 471, 475 (N.D. 1994)
(ellipsis in original). 





[113]  Garza,
435 F.3d at 75 (citing United States v. Femia, 9 F.3d 990, 995 (1st
Cir. 1993)); United States v. Branch, 537 F.3d 582, 590 (6th
Cir. 2008).





[114]  Garza,
435 F.3d at 75 (AWhile the evidence was destroyed as a result of
Quinn=s conscious and deliberate decision, intentionality
is not enough to show bad faith.@); Bailey, 677 N.W.2d at 393 (Adestruction of the evidence was >intentional=@ but was not in bad faith).





[115]  Garza,
435 F.3d at 76 (no bad faith even though Ait was not the >normal= procedure to destroy evidence in cases that were
still open@); United States v. Deaner, 1 F.3d 192, 200
(3d Cir. 1993) (A[W]e have not held that an improper procedure in and
of itself implies bad faith.  While it
may permit such an inference, it does not syllogistically imply the presence of
bad faith as a matter of deductive logic.@); Guzman, 868 So. 2d at 509 (Abad faith does not turn on whether law enforcement
officers followed established procedures@); State v. Lamae, 268 Kan. 544, 551, 998
P.2d 106, 111 (2000) (failure of the DEA to follow its guidelines, though
troubling, not enough to show bad faith).





[116]  Lovitt v.
True, 403 F.3d 171, 187 (4th Cir. 2005) (court clerk exercised Aserious error in judgment@ in destroying evidence); Murray, 849 So. 2d
at 1286 (bad faith is Anot simply bad judgment or negligence@); State v. Hanna, 123 Wn.2d 704, 714, 871
P.2d 135, 140 (1994) (failure to preserve and retain evidence may have
reflected Apoor judgment@ but was based on a reasonable belief that the
evidence would not be relevant to either party).





[117]  Carreno,
363 F.3d at 888 (Sloppy work is not tantamount to bad faith.).





[118]  United
States v. Stevens, 935 F.2d 1380, 1388 (3d Cir. 1991) (test that
destroyed the evidence Amight have inculpated or exculpated@ the defendant but Ano one
knew,@ thus nothing suggested government agents Asuspected that the saliva/semen sample . . . could
form a basis for exonerating@ the defendant); Jobson, 102 F.3d at 218 (Ano evidence that anyone in the Detroit Police
Department or the U.S. Attorney=s office suspected that the tape was exculpatory@); Carreno, 363 F.3d at 888 (Ano evidence government knew, or even suspected, that@ deported witness Awould
testify in [the defendant=s] favor@).





[119]  United
States v. Ramos, 27 F.3d 65, 71-72 (3d Cir. 1994) (due to
inadequate training, government agent affiliated with the DEA believed he was
following office procedure in destroying notes); United States v. Houston,
548 F.3d 1151, 1155 (8th Cir. 2008) (officers not trained to
download video evidence).





[120]  Lovitt, 403 F.3d at 187 n.3; Lovitt v. Warden, 266
Va. 216, 242, 585 S.E.2d 801, 816 (2003).





[121]  Gausvik,
345 F.3d at 818.





[122]  United
States v. Beckstead, 500 F.3d 1154, 1159-60 (10th Cir. 2007)
(Government destroyed the evidence before the defendant had opportunity to notify
the officials that the alleged drug lab and its chemicals were potentially
exculpatory and it was unlikely that further testing of the lab would produce
exculpatory results); United States v. Bohl, 25 F.3d 904, 910 (10th
Cir. 1994) (discussing United States v. Richard, 969 F.2d 849 (10th
Cir. 1992) where government destroyed boxes of marijuana and the defendant did
not show that the government knew he wanted them preserved for trial); Sharp
v. State, 286 Ga. 799, 802, 692 S.E.2d 325, 329 (2010) (State unaware of
exculpatory value of condom that was lost Abefore [defendant] was arrested or identified as a
suspect@); State v. Eason, 133 N.H. 335, 342, 577
A.2d 1203, 1207 (1990) (when police destroyed what they thought was an animal
carcass, they did not know victim had been murdered, much less that the
defendant murdered him).





[123]  Monzo v.
Edwards, 281 F.3d 568, 580 (6th Cir. 2002) (AIt is not enough that the police knew that semen
samples could be determinative of guilt or innocence if preserved or tested.@); State v. Osakalumi, 194 W. Va. 758, 765,
461 S.E.2d 504, 511 (1995) (even though police acted negligently in disposing
of a couch [with a bullet hole] that Awas so obviously a part of a pending police
investigation,@ court could not say their actions were motivated by
bad faith).





[124]  Beckstead,
500 F.3d at 1161.





[125]  Yarris v.
County of Delaware, 465 F.3d 129, 133, 142-43 (3d Cir. 2006)
(plaintiff=s petition alleged that detectives refused a request
to deliver slides to coroner but kept them in a paper bag under a desk until
the biological material rotted and became useless for DNA testing); Stuart,
127 Idaho at 816, 907 P.2d at 793 (AThere is a clear recognition that concealment is one
method of proving that the exculpatory value of the evidence was known to the
government prior to its destruction.@  Prosecution
concealed the existence of a tape recording of a phone call that would have led
to phone logs that were later destroyed.).





[126]  United
States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993) (AThe equipment=s value as potentially exculpatory evidence was
repeatedly suggested to government agents.@  Parole
officer and alleged drug lab=s landlord reported lab=s claims of legitimacy during pre-seizure
investigation.  Law enforcement agents
knew lab was ostensibly configured to make a legal substance rather than
methamphetamine before destroying the lab=s equipment.); Bohl, 25 F.3d at 911 (A[G]overnment was explicitly placed on notice that@ defendants Abelieved the tower legs were potentially exculpatory@ before government destroyed the evidence.  And assertion of potentially exculpatory
value was not merely conclusory but was backed up by objective, independent
evidence.).





[127]  State v.
Jackson, 302 S.C. 313, 316, 396 S.E.2d 101, 102 (1990).





[128]  State v.
McGrone, 798 So. 2d 519, 523 (Miss. 2001) (defense counsel subpoenaed
police officers for two separate hearings, but the officers never appeared).





[129]  Smith,
534 F.3d at 1224-25.





[130]  State v.
Youngblood, 173 Ariz. 502, 506, 844 P.2d 1152, 1156 (1993); State v.
Craig, 490 N.W.2d 795, 797 (Iowa 1992). 
See also Wenzel, 306 Ark. at 533, 815 S.W.2d at 941 (quoting Youngblood=s statement that its standard was directed to Athose cases in which the police themselves by their
conduct indicate that the evidence could form a basis for exonerating the
defendant@).





[131]  See authorities
cited in previous footnote.





[132]  Cf. Boyle
v. Johnson, 93 F.3d 180, 185-87 (5th Cir. 1996) (referring to
accusations that Ralph Erdmann had falsified autopsies and committed perjury in
prior cases); State v. Clifford, 328 Mont. 300, 321 n.4, 121 P.3d 489,
503 n.4 (2005) (referring to Erdmann and Fred Zain as examples of experts who
misstated, altered, or falsified results).





[133]  Texas
Legislature Online History, Bill: SB 3, Legislative Session: 77(R), Council
Document: 77R 1805 GWK-F.





[134]  Id.





[135]  Id.





[136]  Id.





[137]  The habeas
court cited Ex parte Castellano, 863 S.W.3d 476, 480 (Tex. Crim. App.
1993); Mooney v. Holohan, 294 U.S. 103, 112 (1935); and Pyle v.
Kansas, 317 U.S. 213, 216 (1942).





[138]  See
Estrada v. State, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010).





[139]  Id.
at 31.





[140]  Mooney,
294 U.S. at 112.





[141]  386 U.S. 18
(1967).





[142]  Ex parte
Fierro, 934 S.W.2d 370, 372-73 (Tex. Crim. App. 1996).





[143]  Id.
at 373.





[144]  Id.
at 373-74.





[145]  Id.
at 374-75, 374-75 n.10.





[146]  See id.
at 372.





[147]  Id.
at 375 n.10.





[148]  Chabot,
300 S.W.3d at 771-72; see also Ex parte Carmona, 185 S.W.3d 492 (Tex.
Crim. App. 2006).





[149]  Chabot,
300 S.W.3d at 770.





[150]  Id.
at 771.





[151]  The Second
Circuit has suggested that the unknowing use of perjured testimony violates due
process if a stronger showing of materiality or harm is made than is required
by the Chapman standard.  Sanders
v. Sullivan, 863 F.2d 218, 225-26 (2d Cir. 1988).





[152] 313 S.W.3d at 287.





[153]  Id.
at 286-87.





[154]  Id.





[155]  Id. 





[156]  Id.
at 288.





[157]  See Ex
parte Elizondo, 947 S.W.2d 202 (Tex. Crim. App. 1996) (recantation of trial
testimony).





[158]  Ex parte
Chavez, 213 S.W.3d 320, 322 (Tex. Crim. App. 2006).  





[159]  The Supreme
Court has suggested that the knowing use of Afalse@ testimony is treated the same as the knowing use of
perjured testimony.  United States v.
Bagley, 473 U.S. 667, 678, 679 n.8 (1985) (discussing Napue v. Illinois,
360 U.S. 264 (1959)).  





[160]  Fierro,
934 S.W.2d at 372 ns.2, 3.





[161]  Tex. Penal Code '37.02(a).





[162]  United
States v. Tavares, 93 F.3d 10, 14 (1st Cir. 1996).





[163]  United
States v. Carter, 566 F.2d 1265, 1270 (5th Cir. 1978).





[164]  It is at
least questionable whether Chu was a member of the prosecution team and
whether  applicant lacked the opportunity
to discover the perjury at trial or in motion for new trial proceedings.  Given our conclusion that there was no
perjury, we need not address these issues. 





[165]  466 U.S.
668, 693 (1984) (A[A] defendant need not show that counsel=s deficient conduct more likely than not altered the
outcome in the case . . . . The result of a proceeding can be rendered
unreliable, and hence the proceeding itself unfair, even if the errors of
counsel cannot be shown by a preponderance of the evidence to have determined
the outcome.@).





[166]  466 U.S. at
687.





[167]  Id.





[168]  Id.
at 688.





[169]  Wiggins
v. Smith, 539 U.S. 510, 533 (2003) (internal quotation marks omitted).  





[170]  958 S.W.2d
186, 194 (Tex. Crim. App. 1997).





[171]  Id.





[172]  956 S.W.2d
532, 538-39 (Tex. Crim. App. 1997).





[173]  Williams,
958 S.W.2d at 193 n.8 (quoting United States v. Meriwether, 486 F.2d
498, 505‑506 (5th Cir. 1973)).





[174]  See Pope
v. State, 207 S.W.3d 352, 365-66 (Tex. Crim. App. 2006) (citing Williams
and observing that a Asimple solution@ to the possibility that a prosecutor could comment
on the existence of a defense expert is that a party can Ainvestigate first, consult second, designate third@).





[175]  See Tex. R. Evid. 803(18) (ALearned Treatises@
exception to the hearsay rule).





[176]  See id.





[177]  466 U.S. at
694.





[178]  Id.





[179]  Id.
at 693.





[180]  Lockhart
v. Fretwell, 506 U.S. 364, 366 (1993).





[181]  Although not
argued by applicant, a position could perhaps be taken that applicant might not
have testified or might not have insisted on the parole officers= testimony absent Greenlee=s deficient performance on the DNA matters.  Such an argument would not change our
conclusion with respect to prejudice for at least three reasons.  First, even accepting Bromwich=s criticisms, and even without the testimony of
applicant or his parole officers, the evidence so strongly supports conviction
that we would not find a reasonable probability that the outcome would be
different.  Second, effectively
presenting Bromwich=s criticisms to the jury would not change the
apparent need for an alibi, so we cannot find a reasonable probability that
applicant would have refrained from testifying or would have refrained from
insisting on the testimony of his parole officers.  Third, even if it could be shown that
applicant would not have testified, it would be unclear whether he could avoid
the incriminating effects of his testimony under the prejudice prong of Strickland.  The Seventh Circuit and the Supreme Court of
Indiana have suggested that, under Lockhart v. Fretwell, a defendant=s own incriminating testimony, at least where it was
gratuitous, can defeat a finding of prejudice. 
United States v. Parker, 609 F.3d 891, 895-96 (7th
Cir. 2010) (AParker has only himself to blame for admitting under
oath to a quantity of drugs he now disputes.@); Smith
v. State, 689 N.E.2d 1238, 1248 (Ind. 1997) (At sentencing, defendant
testified that Ahe was no longer claiming that he did not molest his
daughter.@  Having Aadmitted that his trial testimony to the contrary
was not truthful,@ the defendant could not Aon appeal make a credible argument that the result
of his trial was unjust and unreliable.@).  No one
forced applicant to testify that the complainant was taken to his house, that
the cocoa butter lotion found at his house was not his, that one of his parole
officers lied, that applicant had no regularly scheduled reporting date, or
that he did not commit the sex offenses for which he had been previously
convicted. 





[182]  See
Skinner v. State, 293 S.W.3d 196, 202-03 (Tex. Crim. App. 2009) (Acounsel explained that he did not ask for testing
because he was afraid the DNA would turn out to be appellant=s@).





[183]  Applicant
also advanced two claims in his habeas application that we did not file and
set: a claim of actual innocence and a Brady claim.  Various aspects of our discussion defeat
these claims as well.  We reject these
claims without further comment.